## INTERSTATE COMMERCE COMMISSION
### v. LOVE.
#### Civil Action No. 1833.

District Court, E. D. Louisiana,
New Orleans Division.

March 29, 1948.

Gregory U. Harmon, of Washington, D. C., Isaac K. Hay, of Atlanta, Ga., and Louis I. Dailey, of Little Rock, Ark., Attys., Bureau of Motor Carriers, Interstate Commerce Commission, Robert Weinstein, U. S. Atty., and N. E. Simoneaux Asst. U. S. Atty., both of New Orleans, La., for plaintiff.

Robert A. Ainsworth, Jr., of New Orleans, La., for defendant.

BORAH, District Judge.

This suit by the Interstate Commerce Commission is brought under the provisions of Sections 204(a) (6) and 222(b) of Part II of the Interstate Commerce Act, 49 U.S.C.A. §§ 304(a) (6) and 322(b), to permanently enjoin and restrain defendant from transporting property by motor vehicle in Interstate Commerce over the public highways, for compensation, as a common carrier until said defendant has secured a certificate or permit from the Commission and filed tariffs or schedules of rates and policies of insurance, in the amount or amounts prescribed by the rules and regulations of the Commission.

The sole question here presented is whether or not the term "fish (including shell fish)" as used in Section 203(b) (6) of the act embraces fresh headless shrimp, packed in ice, and frozen headless shrimp.

The facts, save in the particulars hereinafter mentioned, were stipulated and may be summarized as follows:

During the period from January 7, 1946, to February 19, 1947, inclusive, the defendant transported in interstate commerce by motor vehicle over and upon public highways, for compensation, divers shipments of fresh headless shrimp, packed in ice, and frozen headless shrimp, from several points in the Eastern District of Louisiana, New Orleans Division, to several Eastern points; and whole fish from an Eastern point to a point in Alabama; and potatoes from an Eastern point to a point in Florida. The defendant provided all of said transportation on one motor vehicle unit, consisting of one tractor and one semi-trailer owned by him, which is used exclusively in the transportation of the commodities specified, for compensation.

That at the time said shipments or property were transported by the defendant (1) there was not in force, and there is not now in force, a certificate of public convenience and necessity issued by the Commission authorizing said transportation and such operations by the defendant as a common carrier by motor vehicle, or a permit issued by the Commission authoriz-

ing said defendant to engage in such business as a contract carrier by motor vehicle; (2) there was not published, posted or filed with the Commission and there is not now published, posted or filed with the Commission, any tariffs showing the rates and charges upon which said property was so transported by the defendant as a common carrier by motor vehicle, or any evidence of concurrence by the defendant in, or the acceptance of, any rate or charge of any common carrier by motor vehicle applicable thereto, or any schedule containing minimum rates or charges of the defendant as a contract carrier by motor vehicle applicable thereto.

Defendant has never filed with the Commission any evidence of insurance for the protection of the public as required by the Commission's rules and regulations pertaining thereto, although the defendant did have in effect throughout the period in question, bodily injury and property damage insurance and cargo insurance.

The defendant intends to continue to engage in motor carrier operations of the type and nature herein described, until and unless he is directed by a court of competent jurisdiction to cease and desist therefrom.

The method and procedure for taking, handling, packing and shipping "fresh headless shrimp, packed in ice" are described fully in the stipulation. However, it may be stated here that each boat used in shrimp fishing is manned by a crew of from three to five men and the fishing is done with nets. Before leaving port the boat takes on ten to fifteen tons of crushed ice which is used to refrigerate the shrimp as caught, and the boat usually remains at sea from five to fifteen days before returning to port with its catch. The shrimp, when caught, are promptly washed either by dipping them into the sea in the wash bag or by scattering them on deck and washing them with a pressure hose. If the catch is small and the members of the crew have time that can be spared from their other duties, they break the heads of the shrimp off by hand as soon after the shrimp are caught as possible, usually within a few hours. If the catch is heavy and the crew members are busy with other duties, the heads of the

shrimp are not removed at sea. It is estimated that the heads of approximately fifty per cent of the shrimp are removed at sea. In either case, the shrimp are placed in bins below deck, each bin having a capacity of from eight to twelve barrels. There the shrimp and crushed ice are placed in alternate layers with a thick layer of ice on top until the bin is completely filled. When the boat reaches port the shrimp are removed promptly to the packing shed where they are first thoroughly washed after which they are placed on tables and the heads are broken off by hand from those shrimp not beheaded at sea; the headless shrimp are packed with ice in wooden crates in alternating layers of shrimp and crushed ice with a thick layer of ice on top. The wooden crates are then placed with ice in alternate layers in the insulated refrigerated portion of the semi-trailer of the motor vehicle. The headless shrimp packed in ice are thus transported from the packing sheds to the eastern markets; and the total elapsed time from the arrival of the shrimp at the packing shed to completion of the loading on to the trucks varies from a few hours to as much as twenty-four hours.

The method and procedure for taking, handling, packing and shipping "Frozen headless shrimp" is described fully in the stipulation. However, it may be stated briefly here that fresh headless shrimp, packed in ice, as related in the preceding paragraph are transported from the packing sheds to quick freezing plants located at other points in Louisiana on the insulated refrigerated sub-trailers of the motor vehicle units; promptly upon arrival they are washed, inspected and packed in cartons; the headless shrimp are then quick frozen at a temperature of -20° Fahrenheit within approximately forty-eight hours; the cartons of frozen headless shrimp are then stored in cardboard cases in the storage rooms at a temperature of 32° Fahrenheit for periods ranging from a few days to six months, and in exceptional cases for as much as two years; and following removal from storage they are transported in the insulated refrigerated semi-trailers of the motor vehicle units to the eastern markets.

The terms "headless shrimp," "beheaded shrimp," "deheaded shrimp" and "headed shrimp" as used in this proceeding are synonymous and all of said terms refer to, and are used to describe, shrimp from which the heads have been removed by hand, as described above.

The original stipulation reserved to each of the parties the right to introduce both oral and documentary evidence in addition to but not in conflict with the stipulated facts. It further provided that all such evidence should be subject to objection by either party as to competency, relevancy or materiality. Agreeable to the terms of the stipulation, Versaggi, a witness for defendant, testified that for the past sixteen years he has been engaged continuously in the business of a wholesale fish dealer in New York City and he has never seen shrimp merchandised in any other form than beheaded and that he does not believe that it would be possible to merchandise shrimp in the New York market, the largest in the world, if the shrimp were not deheaded.

At the trial it was stipulated and agreed between the parties that if Dr. James Nelson Gowanloch, Chief Biologist of the Louisiana Department of Wildlife and Fisheries, were called by the defendant as a witness and duly sworn, he would testify on behalf of defendant that the reasons why shrimp are headed before being shipped to market are as follows, to-wit: (1) Forty per cent of the weight of shrimp "with heads on" is made up of the head; removal, therefore, reduces shipping weight by forty per cent; (2) removal of the heads of shrimp improves the quality of the product (a) when shrimp are not headed, enzymes present in the walls of the alimentary tract of the shrimp by their action cause the anterior end of the meat to become wholly undesirable, flabby and brown; (b) if the shrimp are headed within twelve hours of being caught, the posterior portion of the digestive system (the sand vein) will come away with the head, which will greatly improve the market attractiveness of the shrimp when they are peeled; (c) heading of the shrimp within the twelve hour period following their capture will greatly reduce and even completely remove the so-called "iodine" taste which results from material in the "head" and in the "sand vein"; (3) heading of shrimp has become in Louisiana the practically universal procedure for the marketing of the product both in the "fresh" and "fast frozen" condition. The defendant offered this stipulation in evidence and an objection of irrelevancy and immateriality interposed by plaintiff was overruled. While the court well knows that there is a vast difference between admitting what a witness will testify to and admitting that what the witness testifies to is truthful, the fact still remains that no evidence was offered to refute the testimony of Dr. Gowanloch.

### Findings of Fact.

The stipulated facts, including the stipulation with respect to the testimony of Dr. Gowanloch, which are incorporated herein by reference, are adopted by the court as its findings of fact.

### Discussion.

The defendant contends that the vehicles which he operates are exempt from the regulatory provisions of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq., because of Section 203(b) (6) of the act which reads as follows:

"Sec. 203—Definitions and exceptions

"(b) Vehicles excepted from operation of law. Nothing in this chapter, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include * * * (6) motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation; * * *"

Plaintiff's counter contention is that the Commission held to the contrary in the Monark Egg Corporation Contract Carrier Application, 26 MCC 615, and 44 MCC 15, and that this decision has been consistently followed in all subsequent decisions, and for that reason the Commission's holdings are entitled to great weight.

The commodities exclusively carried by vehicles of defendant are (1) fresh headless shrimp, packed in ice; (2) frozen headless shrimp; (3) whole fish; and (4) potatoes. It is rightly conceded by both parties that whole fish and potatoes are excepted commodities.

Thus the narrow question presented for determination is whether or not the term "fish (including shell fish)" as used in Section 203(b) (6) of the act embraces fresh headless shrimp, packed in ice, and frozen headless shrimp.

In the first Division 5 Report in the Monark Egg Corporation case, the Commission said:

"We are of the opinion that by the use of the words 'ordinary livestock' Congress meant live domestic animals kept for farm purposes, including marketable animals, such as cattle, horses, sheep, hogs, and poultry or fowl; that by the use of the words 'fish (including shell fish)' Congress meant whole fresh fish, dead or alive, as taken from the water; and that by the use of the words 'agricultural commodities (not including manufactured products thereof)' Congress intended to include those commodities which are marketable in their natural state and those which have been processed to the extent customarily required to place them in a marketable state by the producer. For example, Congress intended to include ginned cotton, threshed wheat, shucked corn, and cream following separation of the raw milk, but no manufactured product, as for example butter or cheese. We believe that Congress intended an analogy between ordinary live stock and fish (including shellfish); that it did not intend to include any processed or manufactured products thereof; and that the words used are in themselves, without qualification, sufficient to exclude any other interpretation. Accordingly, we are of the opinion that from the standpoint of intent and construction of the language used, Congress intended the words 'not including manufactured products thereof' to modify 'agricultural commodities', and to include in the exemption agricultural commodities which have been processed but only to the extent of forming a part of the harvesting, or to the extent ordinarily customary in the preparing of the commodities for market by the producer."

This report is certainly more liberal in its exemption of agricultural commodities than it is with fish. It holds that the words "not including manufactured products thereof" were intended to modify "agricultural commodities" only, and concludes that Congress intended to include those commodities which are marketable in their natural state and those which have been processed to the extent customarily required to place them in a marketable state by the producer. No such liberality appears to be attached to the word "fish" notwithstanding the fact that the word "fish (including shell fish)" stands alone and is not modified and is not restricted in the statute.

In the second Division 5 Report, the Commission outlined the legislative history of Section 203(b) (6) and with respect to the provision which reads "(6) motor vehicles used in carrying * * * livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof), * * *" said:

"Clearly the legislative history of the clause reveals no more support for the contention that the phrase '(not including manufactured products thereof)' modifies 'fish (including shell fish)' than for the contention that it modifies 'livestock.' If it should be said that the parenthetical phrase 'not including manufactured products thereof' following the words 'agricultural commodities' modifies also the words 'livestock' and 'fish', we should by the same token be forced to say that the parenthetical phrase '(including shell fish)' following the word 'fish' modifies also the prior word 'livestock,' a result which negatives itself. Further negation of these contentions is afforded by an examination of the punctuation employed. A comma is placed after 'livestock,' again after 'fish (including shell fish)', and again after 'agricultural commodities (not including manufactured products thereof)'. We conclude that each of the terms set off by commas is a complete commodity description. It therefore follows that the phrase 'not including manufactured products thereof' relates only to 'agricultural commodities.' "

However, despite this holding which is unquestionably correct, the Division in its second report reaches a conclusion which seemingly can be justified only on the grounds of expediency. It holds:

"* * * The moment we get beyond the original fish as taken onto the boat and consider the various steps by which it progresses to other forms, we become involved in distinctions so subtle as to be wholly impractical as a basis for concluding that any given commodity is within or without the description used in the act. We conclude that only fish and shellfish dead or alive, as taken from the water, are within the purview of this exemption."

This is a more restricted interpretation than that applied by the Division in connection with agricultural commodities, despite the fact that agricultural commodities are restricted by the phrase "not including manufactured products thereof."

■ One of the cardinal rules of interpretation is that the meaning of a statute is to be ascertained from the *words used* and the subject matter to which they relate. The words used are to be taken in their usual and popular sense, except where they are technical, and then according to the acceptation of those learned in the art. The term "ordinary livestock" as defined in section 20(11) of the act has a definite and fixed meaning but the term "fish (including shell fish)" is not defined in the statute and since Congress has not limited the meaning of the word "fish" as was done in the case of "agricultural commodities" it follows that the intention of Congress must be gathered from the words used unless a literal interpretation would lead to a manifest absurdity.

Shrimp, as handled by defendant, either fresh headless shrimp packed in ice, or frozen headless shrimp, continue to be shrimp in their natural state. They still remain, and continue to be known as, shrimp. If the Commission's holdings were followed, they would nullify the exemption accorded motor vehicles transporting shrimp, by virtue of the shrimp being beheaded, because no shrimp are transported to the market which are not beheaded. In this way, and through such an interpretation, the Commission has given no effect whatever to the exemption provided in the statute for fish, insofar as it affects the transportation of shrimp.

The dissent of Commissioner Lee in the second Division 5 Report fully expresses the views of this court, and I am content to close the discussion with his language:

"In my opinion, motor vehicles used in transporting the following commodities, in interstate or foreign commerce, fall within the exemption provided in section 203(b) (6) of the act if no other property and no passengers are transported on such vehicles for compensation at the same time: * * *

"Fish in the various forms in which it is customarily shipped, such as live fish, fish in the round, beheaded and gutted fish, and filleted fish, (frozen, quick frozen, or unfrozen), and also oysters, clams, crabs, lobsters, scallops, and shrimp, with or without shells (including crab meat and lobster meat), when not packed in hermetically sealed containers. * * * .

"Webster's Standard Dictionary defines 'fish' as 'The flesh of fish.' The National Motor Freight Classification lists oysters, clams, crabs, lobsters, scallops, and shrimp, both in the shell and without shells, and round, beheaded, gutted, and filleted fish under the descriptive heading, 'Fish, fresh or frozen' for classification purposes. Thus, when accorded its ordinary and commonly understood meaning, the meaning which is used and understood in transportation parlance, fish (including shellfish) includes fish in the various forms in which it is customarily shipped, when not packed in hermetically sealed containers. When so packed it falls within the well-understood category of canned food or canned goods and is shipped as such. It should be noted that Congress did not limit the meaning of the word 'fish' as was done in the case of 'agricultural commodities.' On the contrary, by the parenthetical phrase '(including shell fish)' Congress indicated that all 'fish' falls within the exemption."

### Conclusions of Law.

■ The court concludes that the Commission's construction of the statute is clearly erroneous and that a different con-

struction is plainly required by the words of the Act. Consequently the rule that the contemporaneous construction of a statute by those charged with its execution is entitled to great weight and should not lightly be overturned, does not apply. United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361.

The court concludes as a màtter of law that the motor vehicles used by defendant exclusively in the transportation in interstate commerce, for compensation, of fresh headless shrimp, packed in ice, frozen headless shrimp, whole fish and potatoes are exempt from regulation by the Commission, under the provisions of section 203(b) (6) of Part II of the Interstate Commerce Act, 49 U.S.C.A. § 303(b) (6), except as to qualifications and maximum hours of service of employees and safety of operation and standards of equipment.

I conclude, therefore, that plaintiff's suit must be dismissed, and the Clerk is directed to enter judgment accordingly.