INTERSTATE COMMERCE COMMISSION
v. ALLEN E. KROBLIN, Inc.
Civ. A. No. 615.

United States District Court
N. D. Iowa, E. D.
June 30, 1953.

600

James A. Murray, Associate Chief Counsel, Interstate Commerce Commission, Washington, D. C., Donald R. Partney, Atty., Interstate Commerce Commission, Kansas City, Mo., and Asa Merrill, Atty., Interstate Commerce Commission, New York City, for plaintiff.

Craig H. Mosier, of Mosier & Mosier, Waterloo, Iowa, for defendant.

Charles W. Bucy, Associate Sol., Washington, D. C., Henry A. Cockrum, and Harry Ross, Jr., Attys., Office of Sol., United States Department of Agriculture, Washington, D. C., for the Secretary of Agriculture, amicus curiae.

GRAVEN, District Judge.

The issue in this case is whether or not the interstate transportation by truck of New York dressed and eviscerated poultry is within the scope of the so-called "agricultural" exemption of the Interstate Commerce Act. Section 303(b) (6) of 49 U.S. C.A.; Section 303(b) (6) of Title 49 of the United States Code. In the United States Statutes at Large, Chapter 498, 49 Statutes 543, 544, that Section appears as Section 203(b) (6). In the legislative history that Section is referred to as Section 203 (b) (6). For that reason it will be referred to herein by that number.

In this action the Interstate Commerce Commission claims that the defendant is engaged in transporting New York dressed and eviscerated poultry in interstate commerce without a certificate of public convenience and necessity. The Commission asks that the defendant be enjoined from so doing until he obtains such certificate. The defendant admits that it is so engaged and that it does not have a certificate of public convenience and necessity. It claims that under the provisions of Section 203(b) (6) it is not required to have such certificate. The defendant having admitted that it is engaged in interstate transportation of property by motor vehicle, the burden is upon it to establish that its activities come within the exemption. U. S. v. Krinvic Bros., D.C.E.D.Pa.1942, 47 F.Supp. 481; U. S. v. Chadwick, D.C.E.D.Pa.1940, 39 F.Supp. 204. The Secretary of Agriculture asked for, and was given, permission to appear as amicus curiae. Counsel for the Secretary of Agriculture also filed written briefs and participated in the oral arguments. The position of the Secretary of Agriculture is the same as that of the defendant and is opposed to that of the Interstate Commerce Commission. The written briefs filed and the oral arguments made in behalf of the plaintiff, the defendant, and the amicus curiae were all outstanding and a credit to the legal profession.

Section 203(b) (6), above referred to, in its present form exempts from the certificate provisions of the Act:

"* * * (6) motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horti-

cultural) commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation".

While Section 203(b) (6) includes fish as well as horticultural commodities, it is commonly and generally referred to as the agricultural exemption.

This particular case is but one engagement of a much larger battle that has been raging for many years. The battle commenced when legislation was proposed granting regulatory powers to the Interstate Commerce Commission as to interstate transportation by motor vehicles and has continued ever since. By the Motor Carrier Act of 1935, now Part II of the Interstate Commerce Act, 49 U.S.C.A. § 301 et seq., Congress granted the Interstate Commerce Commission such regulatory powers. The battle has been, and is being, waged as to what regulatory powers the Interstate Commerce Commission should have as to the interstate transportation by motor vehicles of products generally referred to as agricultural commodities, and as to the exact scope of Section 203(b) (6). Those engaged in interstate transportation by motor vehicle who operate under certificates of public convenience and necessity issued by the Interstate Commerce Commission under the Act are generally referred to as regulated or certificated carriers. Those who are so engaged without being required to obtain such certificates are generally referred to as unregulated or uncertificated carriers. The battle referred to has been waged on the floors of the House and the Senate, before Congressional Committees, before the Interstate Commerce Commission, and in the Courts. In that battle the regulated motor vehicle carriers and the railroads have, in general, contended for very limited exemptions from the certificate provisions of the Act and for a strict construction of the provisions providing for exemptions. Farm groups, other groups interested in the scope of the coverage of Section 203(b) (6), the unregulated carriers, and the Department of Agriculture have in general advocated a broad statutory exemption from the certificate provisions of the Act and for a liberal construction of the exemption provision as enacted.

The controversy has largely resolved around the matter of the exemption in favor of commercial truckers engaged in hauling farm and other commodities. There has been little controversy as to the exemptions in favor of farmers who use their own trucks to haul their produce to market and in hauling supplies to their farms.

Chapter 1 of the Motor Carrier Act of 1935 declared the National Transportation Policy. This same statement of policy was, by Act of September 18, 1940, c. 722, Title I, § 1, 54 Stat. 899, inserted before Part I of the entire Interstate Commerce Act, 49 U.S.C.A. note preceding section 1, to become the policy of the entire Act. That statement of policy is as follows:

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

It has been and is the view of the Interstate Commerce Commission that since the Motor Carrier Act was remedial legislation the Act as a whole should be liberally construed to carry out its over-all purpose and policy. It has been, and is, the position of the Interstate Commerce Commission that a liberal construction of the exemptions from the Act would tend to defeat and negative the over-all purpose and policy of the Act and that the carrying out of such purpose and policy requires a strict construction of its exemptions. It is also the view of the Interstate Commerce Commission that the existence of a large number of carriers engaged in interstate transportation who are not subject to the certificate provisions of the Act tends to break down and seriously impair the general regulatory authority and powers assigned to it by Congress.

In 1952 the Senate Committee on Interstate and Foreign Commerce held committee hearings on a number of bills, including S. 2357. That bill as originally introduced provided for a narrowing of the scope of the agricultural exemption. The hearings were reported at pages 371 to 522 of a document entitled "Domestic Land and Water Transportation Hearings Before The Committee on Interstate and Foreign Commerce, United States Senate, Eighty-Second Congress, Second Session." That document will hereafter be referred to as Senate Hearings S. 2357 or as S.H.–2357. At those hearings statements were made which indicate some of the problems presented by the existence of unregulated carriers. In S.H.–S.2357, on page 403, the following appears:

"Senator Bricker. * * * On the other hand, you have got a competitive situation here between those who have to pay the charges of regulation, who have to be confined to certain routes, who have to enter into contracts, * * * with those who have absolutely no regulation, no responsibility to any public authority at all, and it largely comes under the exemption here of agricultural products * * *."

It has been, and is, the view of the Department of Agriculture that by enacting the agricultural exemption Congress intended it to be of aid to those engaged in agriculture and such Congressional intent should not be frustrated by administrative and judicial construction and interpretation.

In 1950 under S.Res. 50, 81st Congress, 2d Session, extensive hearings were held by the Senate Committee on Interstate Commerce relating to transportation matters, including the agricultural exemption. The report of those hearings will hereafter be referred to as S.Res. 50.

Ever since the passage of the Act there has been present the "brooding omnipresence" of "trip leasing." "Trip leasing" and matters connected with it are an important part of the background of the general battle that has been waged in connection with the agricultural exemption. That background is also explanatory of some of the attitudes and positions taken by the Interstate Commerce Commission, the Department of Agriculture, and other interested parties.

The movement of agricultural and other exempt commodities is in general a one-way movement. That movement is from the areas of production to the principal market points. In general, there is no substantial movement of exempt commodities from such market points back to the areas of production. Thus, those uncertificated carriers who haul exempt commodities to the market points are confronted with the matter of return loads. Without return loads the original hauling of exempt commodities to the market points tends to be economically unprofitable. In general only non-exempt commodities are available for return loads, the hauling of which requires a certificate from the Interstate Commerce Commission, which the uncertificated carriers lack. In order to haul return loads of non-exempt commodities, it is necessary for the uncertificated carriers to haul them under the certificate of a certificated carrier. In order to haul such loads under the certificate of a certificated carrier, the practice of trip leasing developed. It

should be noted, however, that the practice of "trip leasing" is not confined to uncertificated carriers hauling exempt agricultural commodities. Under the practice of "trip leasing" an uncertificated carrier who had hauled a load of exempt agricultural commodities from the area of production to a market point would at such point, by means of brokers or otherwise, contact certificated carriers whose certificates permitted them to haul certain non-exempt commodities from such market point to points in the vicinity of the area of production. If a certificated carrier had a load available and was lacking in equipment, or could bargain with the uncertificated carrier and secure a rate by which it could profit, an arrangement would be entered into whereby the uncertificated carrier would "trip lease" his truck for the return trip only. Either the uncertificated carrier or one of his employees would act as driver. The vehicle then being under lease to a certificated carrier was eligible to haul non-exempt commodities under the certificate of such carrier. The method of compensating the lessee for the use of his equipment varied. Under the more usual arrangements the owner and lessor of the leased vehicle received a percentage of the freight charged by the certificated carrier.

Ever since the practice of "trip leasing" was initiated, it has been the position of the Interstate Commerce Commission that "trip leasing" gave rise to many of the very evils which originally brought about the passage of the Motor Carrier Act. In Senate Hearing S. 2357, supra, on page 395, the statement is made that most of the unregulated or uncertificated carriers engaged in hauling exempt agricultural commodities are "small owners who perhaps own one or two or three or four trucks at the most." It is indicated that the number of such carriers runs into the thousands. However, in the report on S.Res. 50 it was stated that sometimes a regulated carrier will set up an affiliated corporation to conduct operations which are exempt from regulation under the agricultural exemption. In other places in that report it was indicated that some of the commercial truckers operate a considerable number of trucks in the exempt field. In the course of argument it was stated that the defendant in the present case operated from 10 to 12 trucks in the hauling of dressed poultry. On page 378 of the report of Senate Hearing S. 2357 a witness stated that the agricultural exemption promoted "trip leasing" and the evils connected therewith; that the transient, temporary, and in many cases the loose nature of the arrangements, whereby trucks are "trip leased" to be operated under the certificate of a certificated carrier, make for loose control of such vehicles by the certificated carriers; make for difficulty on the part of the Interstate Commerce Commission in the matter of inspection and regulation, especially in regard to matters of safety; and that the practice resulted in economically destructive rates. In the report under S.Res. 50, on page 1218 thereof, a witness stated that in "trip leasing" some certificated carriers were able to and in fact did exploit the uncertificated or "gypsy" carriers because of the economic necessities of the latter. In the case of American Trucking Ass'ns, Inc., v. United States, 1953, 344 U.S. 298, 73 S.Ct. 307, the United States Supreme Court discusses some of the problems and evils connected with "trip leasing." Fairly soon after the passage of the Act the Interstate Commerce Commission stated in Monroe Common Carrier Application (July 9, 1938) 8 M.C.C. 183 that the agricultural exemption was inapplicable to any vehicle which was being used to haul both exempt and non-exempt commodities even though not hauled on the same load. In other words, the Interstate Commerce Commission made the test for the exemption the use to which the truck was put and not the commodity hauled at a particular time. Such a construction, if upheld, would have for all practical purposes ended "trip leasing" of trucks of uncertificated carriers engaged in hauling exempt agricultural commodities. However, that construction was stricken down by the courts in the cases of Interstate Commerce Commission v. Service Trucking Company, 3 Cir., 1951, 186 F.2d 400; Interstate Commerce Commission v. Service Trucking Company, D.C.

E.D.Pa.1950, 91 F.Supp. 533; and Interstate Commerce Commission v. Dunn, 5 Cir., 1948, 166 F.2d 116. These cases will be referred to later in more detail. The Interstate Commerce Commission in the recent case of In re William Blaue, decided on March 25, 1953, followed the rule of the Dunn and Service Trucking Company cases in the construction of the so-called "newspaper" exemption of the Act, Section 203(b)(7).

The decisions in the Dunn and Service Trucking Company cases pretty well ended any hope that "trip leasing" could be regulated or stopped by construction of the pertinent statutory provisions of the agricultural exemption.

On January 10, 1952, S. 2357 was introduced in the 82d Congress, 2d Session. That bill, as originally introduced, contained *inter alia* a provision denying the agricultural exemption to motor vehicles hauling any of the commodities referred to therein if such vehicles were used on the return trip or customarily for any other kind of transportation for compensation. That provision, if enacted, would have ended "trip leasing" so far as motor vehicles engaged in hauling exempt agricultural commodities were concerned. The Senate Committee conducting the hearings under S.Res. 50 held extensive hearings on S. 2357 but Congress did not enact it. On May 8, 1951, the Interstate Commerce Commission, acting under rule making authority claimed to have been granted it under the Act, proposed a number of rules relating to the use and exchange of equipment between motor carriers. Ex parte M.C.–43, Lease and Interchange of Vehicles by Motor Carriers, 52 M.C.C. 675. Those rules, among other provisions, provide that where authorized motor carriers enter into leases of motor vehicles which are to be driven by the owners of the leased vehicles or their employees, the lease period must be for a period of not less than thirty days. Suits challenging the legality of the rules were promptly instituted. In those suits the plaintiffs challenged the asserted authority of the Interstate Commerce Commission to promulgate the rules. They further challenged the validity of the rules on a number of grounds. The issues raised by the suits were passed upon by the United States Supreme Court in American Trucking Ass'ns, Inc., v. United States, 1953, 344 U.S. 298, 73 S.Ct. 307. The Court, with two Justices dissenting, upheld the authority of the Interstate Commerce Commission to promulgate the rules and held the rules to be valid. On page 314 of 73 S.Ct. the Court states: " * * * All agree that the rules thus abolish trip leasing. * * *" It was contended in behalf of the plaintiffs that the rules were invalid because of their effect upon the agricultural exemption. That contention was overruled. The dissenting Justices were of the view that the rules were destructive of the agricultural exemption.

Counsel for the Interstate Commerce Commission stated, in the course of oral argument in this case, that the rules, 52 M.C.C. 675, had not as yet been put into effect.

It is the view of counsel for the Secretary of Agriculture, as expressed during the course of argument, that the rules referred to constituted a successful "flank attack on the agricultural exemption" and that the present action and similar actions constitutes an attack from another flank which, if successful, will for all practical purposes nullify the agricultural exemption so far as poultry is concerned.

Following the decision of the United States Supreme Court in American Trucking Ass'ns, Inc., v. United States, supra, there was introduced into Congress H.R. 3203. It is a bill providing for the vacation of that portion of the rules referred to relating to the thirty days' leasing period. The House Committee on Interstate Commerce by H.Rept. 519 has recommended favorable action thereon. On May 18, 1953, the Interstate Commerce Commission in Ex parte M.C.–43 modified the rules referred to in regard to the thirty days' leasing period. Under the modified rules, motor vehicles owned by a producer or grower of agricultural commodities or livestock who has used his motor vehicles to haul such commodities or livestock to market and motor vehicles used to haul to market the items specified in Section 203 (b)

(6) may under certain conditions be leased for return trips for a lesser period than thirty days.

In the report under S. .50, it was stated that only an infinitesimal amount of poultry was dressed by the farmers themselves. Counsel for the Interstate Commerce Commission in the course of argument stated the overwhelming number of truckers who are engaged in hauling New York dressed and eviscerated poultry have secured certificates. He further stated that the fact that the defendant and a minority of truckers are operating as uncertificated carriers in the same field is breaking down and impairing the administration of the Act and is subjecting the certificated carriers to a particularly injurious form of competition.

While the uncertificated carriers are generally referred to as unregulated carriers, it should be noted that such carriers are not entirely free of regulation. In the Act as originally enacted, it was provided by Section 204 (3) thereof, 49 U.S.C.A. § 304 (3), that, "if need therefor is found" by the Interstate Commerce Commission, private carriers could be made subject to the safety regulations, the equipment regulations, and the regulations relating to the qualifications and maximum hours of service of employees prescribed by the Commission under the Act. The Commission fairly soon after the Act became effective found that such need existed. Uncertificated carriers are now subject to those regulations.

In the present case the defendant is a corporation that owns and operates a number of trucks which are used to haul New York dressed and eviscerated poultry from points in Iowa to Chicago, Illinois, and other points in other states. New York dressed poultry is defined by those engaged in the poultry trade as being poultry with the head and feathers removed and in some instances with the feet also removed. Eviscerated poultry is defined by those engaged in the poultry trade as poultry with the head, feet, feathers, and entrails removed and with the liver, heart, and gizzard cleaned, wrapped, and replaced in the carcass.

The parties stipulated as to the matters set forth in this paragraph. Poultry raising is an important segment of agriculture in Iowa and dressed poultry is a major farm product of the state. The shipping of poultry is seasonal in nature and with very few exceptions all dressed poultry is hauled between September 1st and December 31st. The shippers of poultry hauled by the defendant operate plants at various points in Iowa. Such shippers purchase chickens, turkeys, and other poultry from the farmers and dress the poultry at their plants prior to shipping. Each plant is equipped with a production chain upon which the fowls are placed and killed. They are then moved on the chain through various stages of processing which consists of removing the feathers, singeing, and rubbing. They are then stored in a refrigerator room for precooling to a specific temperature prior to shipment.

The exemption provision referred to exempts from the certificate provisions of the Act motor vehicles used in carrying "* * * ordinary livestock, * * *, or agricultural * * * commodities (not including manufactured products thereof), * * *." The provision as originally enacted did not contain the word "ordinary" in front of the word "livestock." The first change made by Congress in Section 203 (b) (6) following its original enactment was made in the Transportation Act of 1940, 54 Stat. 921. Congress in that Act inserted the word "ordinary" before the word "livestock." In the report under S. Res. 50, page 823, it was stated that "The effect of this change, among other things, was to lead the Commission to change its interpretation of the status of poultry which it had first classed as livestock (and therefore exempt only when alive) * * *." One portion of the exemption provision referred to exempts vehicles which are carrying "agricultural * * * commodities (not including manufactured products thereof), * * *" The parties are in agreement that live poultry is an agricultural commodity. They are in disagreement as to whether New York dressed and. eviscerated poultry is an "agricultural commodity" or a "manufactured product." While eviscerated poultry is somewhat more extensively processed than is New York dressed poultry, yet counsel in argument

stated that no distinction is claimed as between the two so far as the agricultural exemption is concerned. Since the parties are in agreement that live fowls as they leave the farm are an "agricultural commodity," the real disagreement between the parties is as to when they become a "manufactured product." It is the claim of the Interstate Commerce Commission that they probably become such upon being killed and in all events after they have been New York dressed or eviscerated. It is the claim of the defendant and the Secretary of Agriculture that by such dressing or eviscerating the fowls have not as yet reached the point where they can be properly and legally classified as a "manufactured product" and that something further or other is required before they have that status.

In a number of the fields of law the question has arisen as to what steps, or processing, are necessary before a particular item can be classified as a "manufactured product." Much difficulty has been experienced in interpreting the word "manufactured" used in Section 203(b) (6). In the report under S.Res. 50, a witness stated (p. 802) that much of this difficulty was occasioned by the fact that the word "manufactured" has not been commonly used in statutes dealing with agriculture and that the word most commonly used is "processed." The same witness stated (p. 803) there were a number of jurisdictions in which it was held that slaughtering was not a manufacturing business. The parties have cited and discussed decisions in cases arising under Tariff Acts and the Patent Act as what constituted a "manufactured" article within the purview of those Acts. Some of the decisions contain definitions of "manufacture," "manufactured," and "manufactured products." Some of the decisions set forth tests which the parties claim are applicable and determinative in the present case. The parties also presented a number of non-judicial definitions and tests which are claimed to be applicable and determinative. In that connection the defendant and the Secretary of Agriculture cite and rely upon the cases hereafter referred to. In the case of Frazee v. Moffitt, C.C.

N.D.N.Y.1882, 20 Blatchf. 267, 18 F. 584, it was held that hay was not a manufactured product. That case arose under a federal statute which imposed an import duty at a certain rate upon unmanufactured articles and at another rate upon manufactured articles. In the case of Hartranft v. Wiegmann, 1887, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012, it was held that sea shells which had been subjected to processing whereby two or three layers of each shell were removed and the inner shell polished on an emery wheel and mottoes etched on the polished inner shell were not manufactured articles under the Tariff Act. In the case of Anheuser-Busch Brewing Ass'n v. United States, 1908, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336, it was held that corks which had been extensively processed were not manufactured articles under the Tariff Act. The defendant and the Secretary of Agriculture call attention to the following statement of the Court in the latter case, 207 U.S. at page 562, 28 S.Ct. at page 206:

> "* * * Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, as set forth and illustrated in Hartranft v. Wiegmann, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012. There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' * * *"

The defendant and the Secretary of Agriculture particularly rely upon the definition of the word "manufacture" approved in the case of American Fruit Growers, Inc., v. Brogdex Co., 1931, 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801. In that case the Court held that an orange which had become impregnated with a borax solution through immersion in a solution and thereby rendered resistant to blue mold was not a manufactured article within the meaning of the Patent Law. Interestingly, the Interstate Commerce Commission, in the report in a proceeding entitled "Determination of Exempted Agricultural Commodities," 52 M.C.C. 511, stated that the defi-

nition which was approved in the Fruit Growers case was the appropriate and applicable definition to be used in connection with the determination of whether a commodity is or is not a "manufactured product" under the agricultural exemption. The definition referred to is as follows, at page 11 of 283 U.S., at page 330 of 51 S.Ct.:

> " 'Manufacture,' as well defined by the Century Dictionary, is 'the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties, or combinations, whether by hand-labor or by machinery'; also 'anything made for use from raw or prepared materials.' "

It is the claim of the defendant and the Secretary of Agriculture that under the latter definition dressed poultry is not a manufactured product. The Interstate Commerce Commission making use of the same definition concluded that dressed poultry is a manufactured product. The Interstate Commerce Commission presented a booklet issued by the Executive Office of the President, Bureau of the Budget, dated November, 1945, Part I, entitled Standard Industrial Classification Manual. On page 7 thereof there is included as "manufacturing" establishments "Establishments primarily engaged in killing, dressing, packing, and canning poultry, rabbits, and other small game for the trade * * *." At the trial the defendant presented evidence to the effect that the Department of Agriculture in its statistical reports and in general had classified dressed poultry as a non-manufactured product. When the Secretary of Agriculture later appeared as amicus curiae he contended similarly.

The definitions relied upon by the parties are broad, general definitions. The relating of them to a particular article, product or commodity requires still further defining of the words used in the definition, i. e., a defining of the definition. In the present case it has been a case of "thrust and parry" (see 30 Vanderbilt L.Rev., pp. 401–406) between the parties in the matter of relating definitive words to the particular commodity involved. This Court is of the view that the tracing out of the meaning of "manufactured products" in the agricultural exemption by means of general definitions and the attempted definition of those definitions would only lead into a semantic wilderness. All of the parties are agreed that the words "agricultural commodities" and "manufactured products thereof" used in the agricultural exemption are ambiguous words. They are not defined in the Act. Therefore, it is necessary that resort be made to decisions construing the provisions of the agricultural exemption and to the extrinsic aids of legislative history and administrative interpretation. See Jones, Extrinsic Aids in the Federal Courts, 25 Iowa Law Review 737 (1940). It would seem desirable to first refer to decisions and matters connected with administrative, interpretative, and legislative history in a general chronological order.

While Section 203(b) (6), the particular provision being here considered, is generally referred to as the agricultural exemption, yet it should be noted that in the exemption sections of the Motor Carrier Act there are three provisions which are related to or have some connection with the transportation of agricultural products. Subparagraph (9) of Section 203(b) provides for the exemption of " * * * the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business, * *." That provision was in the draft of the Act that was first presented to Congress by Coordinator Eastman. So far as farmers were concerned, it would permit one farmer to haul an occasional load of farm produce for another farmer. The casual or occasional exemption, in practically the same form as it now exists, was included in the bill H.R. 5262, 74th Congress, 1st Session (1935). In the reported hearings on that bill, entitled "Hearing Before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives, Seventy-Fourth Congress, First Session, on H.R. 5262 and H.R. 6016," Coordinator Eastman stated, at page 46

thereof: "* * * It was really intended to cover the situation of the farmer more than anything else. The farmers operate their own trucks in many instances, and may occasionally do some trucking for their neighbors." Subparagraph 4(a) of Section 203(b) of the Act exempts "motor vehicles controlled and operated by any farmer when used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm". Subparagraph (6) of Section 203(b), the exemption here involved, originated in the House Committee on Interstate and Foreign Commerce after the bill had passed the Senate and been sent to the House. Subparagraph (4a), exempting trucks operated by farmers themselves, came in as an amendment from the floor of the House. In later Congressional hearings relating to the Act some witnesses made reference to this paragraph, (4a), as being the "farm exemption" when what was being considered by the Committee at the time were the provisions of subparagraph (6), here involved. The salient feature of subparagraph (6) was that in contrast to subparagraph (4a), which provided exemption only for trucks operated by the farmers themselves, it, subparagraph (6), provided exemption for motor vehicles operated by others than the farmers themselves and thus exempted trucks operated by commercial truckers, and as heretofore noted it is the matter of the exemption to such truckers around which the battle has raged and still rages. Subparagraph (6), when first reported out by the House Committee as an amendment, contained the words "unprocessed agricultural products." Those words were later deleted and the following words now appearing in subparagraph (6) were inserted: "Agricultural commodities (not including manufactured products thereof)." It should be noted that some of the statements and discussion set forth in the legislative history as to the meaning and coverage of the paragraph were made before the change in language was made. It should also be noted that subparagraph (4a), which came in as an amendment from the floor of the House, came in after there had been considerable discussion of the Committee Amendment which in final form is subparagraph (6) here involved.

Bills similar to the bill which ultimately became the Motor Carrier Act of 1935 had been introduced in the 69th Congress and each succeeding Congress up to 1935. The Act was approved August 9, 1935, c. 498, 49 Stat. 543. The bill which became the Motor Carrier Act was drafted by the late Charles F. Eastman, one of the country's notable public servants and an outstanding expert in the field of transportation. He served as a member of the Interstate Commerce Commission for 25 years and also served as Federal Coordinator of Transportation under the Coordinator of Transportation Act, Emergency Railroad Transportation Act of 1933, c. 91, 48 Stat. 211. He was also the head of the Office of Defense Transportation in which position he was serving at the time of his death. Mr. Eastman drafted the bill while serving as Federal Coordinator of Transportation as one of the duties of his office as Coordinator. Section 13 of the Emergency Railroad Transportation Act of 1933 made it the duty of the Coordinator, among other things, "to investigate and consider means, not provided for in this title, of improving transportation conditions throughout the country". It also made it his duty, from time to time, to "submit to the Commission [that is the Interstate Commerce Commission] such recommendations calling for * * * legislation to these ends as he may deem necessary or desirable in the public interest", and those recommendations were to be transmitted to the President, and to the Congress, with the comments of the Commission. He transmitted it to Congress where it was introduced by Senator Wheeler as S. 1629. It was referred to the Senate Committee on Interstate Commerce. At 79 C.R. 5485 it was reported out of that Committee accompanied by Senate Report 482. The report was general in character and did not refer to the matter of exemptions. The discussion on the floor of the Senate appears commencing with page 5,649 of 79 C.R. At this time the bill contained the exemption for "casual or occasional or reciprocal transportation" which it was stated was

to exempt farmers and others who occasionally hauled for hire. 79 C.R. 5,650, 5,651 and 5,652. The bill was passed by the Senate with this exemption but without a specific exemption covering farmers or farm commodities. 79 C.R. 5,737.

It was sent to the House and referred to the Committee on Interstate and Foreign Commerce, 79 C.R. 5,912. It was reported out by that Committee accompanied by House Report 1645. 79 C.R. 11,813. That House Committee inserted an amendment which exempted "Motor vehicles when used exclusively in carrying livestock or unprocessed agricultural products." There was a discussion on the floor of the House between Mr. Whittington and Mr. Sadowski as to the insertion of this amendment by the House Committee. 79 C.R. 12,225. House Report 1645 did not discuss this new exemption which the Committee had added. But the bill was discussed by various members of the House while considering House Resolution 314 which was to make S. 1629 a special order of business. 79 C.R. 12,196 through 12,200. The bill was debated on the floor of the House on July 31, 1935. 79 C.R. 12,204–12,237. The scope of the coverage of the agricultural exemption as it then existed was discussed. Mr. Sadowski stated that "unprocessed farm commodities" meant "anything that has not been canned or manufactured or processed" and said it included cream and milk. 79 C. R. 12,205. At 79 C.R. 12,218 Mr. Jones stated that he expected to offer an amendment which would exempt "Motor vehicles controlled and operated by any farmer and used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farms; * * *." This would permit the farmer hauling his crop to market to haul his supplies back home. This was objected to on the ground that it was already covered by the then present exemption exempting casual or occasional transportation.

At 79 C.R. 12,220, Mr. Pettengill offered the following amendment to the committee amendment: " * * * strike out the words 'unprocessed agricultural products' and insert in lieu thereof 'agricultural commodities not including manufactured products thereof.'" Also at 79 C.R. 12,220 Mr. Pettengill stated, "Mr. Chairman, we have heard a good deal of discussion this afternoon as to what is a processed agricultural product, whether that would include pasteurized milk or ginned cotton. It was not the intent of the committee that it should include those products. Therefore, to meet the views of many Members we thought we would strike out the word 'unprocessed' and make it apply only to manufactured products." Mr. Whittington, at 79 C.R. 12,220, stated, "In other words, under the amendment to the committee amendment, cotton in bales and cottonseed transported from the ginneries to the market or to a public warehouse would be exempt, whereas they might not be exempt if the language remained, because ginning is sometimes synonymous with processing." Mr. Pettengill, at 79 C.R. 12,200, stated, "That is correct." This amendment was agreed to. 79 C.R. 12,220.

Mr. Bland offered an amendment as follows: " * * * After the word 'livestock,' insert a comma and the following: 'fish, including shellfish.'" The amendment was adopted. 79 C.R. 12,220.

The amendment proposed by Mr. Jones, which specifically covered farmers, was formally offered. 79 C.R. 12,220. The contention was again made that the matter was already covered by the casual exemption. The Jones amendment was adopted at 79 C.R. 12,222 and is now Section 203(b) (4a) of the Act.

■ At 79 C.R. 12,225 Mr. Whittington proposed an amendment which would strike out that language that would give the Interstate Commerce Commission discretionary power to nullify certain exemptions of the Act. This was objected to on the grounds that the Interstate Commerce Commission needed the discretion relative to those exemptions in order to administer the Act. Thereupon, at 79 C.R. 12,225, Mr. Ford asked: "Does not the gentleman think it would be better for the Congress to decide what should be exempted rather than to leave it in the hands of the Commission that might nullify the entire intentions of Congress?" A substitute amendment for the one offered by Mr. Whittington was

offered Mr. Pettengill at 79 C.R. 12,226, which substitute amendment was agreed to. It made the exemptions relative to agricultural commodities mandatory. As the Act now exists, all the exemptions provided for in subparagraphs (1) through (7a) of Section 203(b) are mandatory while exemptions provided for in subparagraphs (8) and (9) of Section 203(b) are discretionary with the Interstate Commerce Commission. Thus, the exemption relating to trucks operated by the farmers themselves is mandatory, the exemption covering livestock and agricultural commodities herein involved is also mandatory, while the exemption dealing with casual transportation is discretionary with the Interstate Commerce Commission.

At 79 C.R. 12,226, Mr. Gilchrist offered an amendment which would have substituted the word "primarily" in place of the word "exclusively" in the exemption dealing with agricultural commodities. This was rejected. 79 C.R. 12,227. At 79 C.R. 12,-279, Mr. Michener made a statement about S. 1629 prior to the final vote on it: "* * * The bill has been amended in numerous particulars. The farmer is especially cared for. And the bill on which we will vote today, in my judgment, fully protects farm trucking." The amended bill passed the House. 79 C.R. 12,279. The amended bill was sent to the Senate, 79 C.R. 12,459, where the amendments were read and discussed. At 79 C.R. 12,460 Senator Wheeler was asked to explain the amendment, whereupon he stated: "Mr. President, the House amended the bill in minor details, generally liberalizing the provisions of the measure with reference to trucks which are owned by farmers, and which carry farm products. The bill was also liberalized with reference to associations of cooperative farm organizations. It was liberalized in those respects. I personally have no objection to the amendments, and think the bill is improved." The amended bill was examined and signed in the Senate. 79 C. R. 12,617. Signed by the Speaker of the House at 79 C.R. 12,709. Presented to the President at 79 C.R. 12,712 and approved and signed by the President on August 9, 1935. 79 C.R. 12,863.

Soon after the passage of the Act a contemporary writer made the following comment relating to the matter of the exemptions:

"* * * The exemptions applying to vehicles of farmers and farm organizations have little effect since these vehicles would be classed as private carriers of property in most cases, subject only, and then conditionally, to safety of operations and hours of service regulations. However, the exemptions applying to vehicles used exclusively in transporting livestock, fish, agricultural products, and newspapers are another matter. Their effect will be to exclude from the authority of the Commission, so far as business regulation is concerned, an extensive field of for-hire trucking within which there has been an intensive and rapid development. Doubtless the decision to exclude these operations can be attributed in part to strong opposition from farm and newspaper organizations as well as to a belief that to leave unregulated these widespread but often irregular and seasonal operations would simplify the problem of administration of the Act. Similarly, the conditional exemption accorded casual, occasional, or reciprocal for-hire operations was doubtless made for practical reasons, for such operations neither present serious problems nor are susceptible of effective regulation * * *." Nelson, the Motor Carrier Act of 1935, 44 Journal of Political Economy 464, 479 (1936).

In 1938 subsection (b) (6) was amended by the Act of June 29, 1938, § 3, which omitted "exclusively" following "used" and added "if such motor vehicles are not used in carrying any other property, or passengers, for compensation". C. 811, § 3, 52 Stat. 1237. The bill number was H.R.9739.

Also, in 1938, the three following bills were introduced at the 75th Congress, 3d Session: S. 3768, S. 3941, and H. R. 10508. None of these bills became law.

S. 3768 was introduced on April 20, 1938, and was designed to amend subsection (a) of section 203 of the Motor Carrier Act by

defining the term "agricultural commodities" by adding the following new paragraph at the end thereof:

"(22) The term 'agricultural commodities' includes, among other things, (A) all unmanufactured products obtained by cultivation and tillage of the soil, dairying, forestry, horticulture, or market-gardening; (B) all unmanufactured products obtained as a result of raising or keeping livestock, bees, or poultry; (C) fruits, vegetables, nuts, nursery products, ferns, flowers, bulbs; and (D) naval stores as defined in the Naval Stores Act."

This bill was referred to the committee and died.

S. 3941 was introduced on April 20, 1938, to amend section 203(b) (6) by offering a substitute for (6) as follows:

"(6) motor vehicles used in carrying property consisting of livestock, fish (including shellfish), or agricultural commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation."

This was an attempt to eliminate the exemption for any vehicle which hauled nonexempt commodities at any time. The bill was not enacted.

H. R. 10508 was introduced May 3, 1938. It was identical to the bill S. 3941 referred to above and never became law.

On May 6, 1939, the Frank Battaglia Common Carrier Application, No. M.C.-89358, 18 M.C.C. 167, was denied by the Interstate Commerce Commission. The application was originally heard by a Joint Board, composed of representatives of California, Oregon, and Washington, which recommended the action taken by the Commission. The applicant sought a certificate of public convenience and necessity to haul butter, cheese, eggs, and dressed poultry. He had previously been hauling fresh fruits and vegetables. In the course of the opinion the following statement was made: "* * * Butter, cheese, and dressed poultry are manufactured commodities for the

transportation of which authority under the act is necessary * * *."

On May 27, 1939, the Legislative Committee of the Interstate Commerce Commission addressed a letter to Senator Wheeler, Chairman of the Senate Committee on Interstate Commerce, in which it was proposed that section 203(b) (6) be rewritten so as to restrict the scope of the provision. The letter explained that the provision now "applies to transportation of agricultural commodities for the commission-man, broker, and other distributors of farm products both processed and unprocessed" and that such a broad exemption in its judgment constituted an unwarranted discrimination. This proposal for section 203(b) (6) was as follows:

"* * * Motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish) or agricultural commodities (not including manufactured products thereof) from the point of production to the point of primary market, processing, manufacture, or transshipment, if such motor vehicles are not used in interstate or foreign commerce in carrying any other property or passengers for compensation."

This proposal was not adopted. Senate Hearing S. 50, page 822.

On January 29, 1940, the Legislative Committee of the Interstate Commerce Commission proposed a change in the provisions of Section 203(b) (6). The proposal was contained in a letter addressed to the Chairmen of the House and Senate Committees on Interstate and Foreign Commerce Senate Hearing S. 50, page 823. Those Committees had under consideration S. 2009 which proposed to end the exemption for the transportation of the commodities referred to in Section 203(b) (6) at the point where those commodities first entered the channels of commerce. The proposal of the Interstate Commerce Commission was rejected. The portion of that letter bearing on this phase was as follows:

"(b) As the exemption in paragraph (h) is now worded, in many cases it does not affect transportation for the

farmer but applies to transportation of agricultural commodities for the commission man, broker, and other distributors of farm products both processed and unprocessed, a discrimination in favor of one type of commodity which seems unwarranted. In some 21 State statutes this difficulty has been met by limiting the exemption to the transportation of agricultural commodities and livestock from the point of production to the primary market or like point. We suggest, therefore, that the paragraph be amended to read as follows: (h) The transportation of property consisting of ordinary livestock (including poultry), whole fresh fish (including shellfish), or agricultural commodities (not including manufactured products thereof), in the first movement from the point of production to the point of sale by the producer, or to the point of manufacture or transhipment. The point of production for fish shall mean the wharf or other landing place at which the fisherman debarks his catch, and the point of production for livestock or agricultural products shall include the point at which they are gathered for initial shipment to the point of first sale, manufacture, or transhipment. The point of first sale shall not be deemed to include the point of production."

The House Committee made a report, House Report No. 2832, to accompany S. 2009. In that Report (p. 75), dealing with Section 18(b)(3) of S. 2009, relating to motor vehicles operated by farmers under Section 203(b)(4a), it reported:

"The conference substitute in section 18(b)(3) amends this provision by providing that the exemption shall apply only when such motor vehicles are used in such transportation."

Also on p. 75 of the report, dealing with Section 18(b)(5), ordinary livestock, it reported:

"The conference substitute amends section .203(b)(6) of the Interstate Commerce Act which provides among other things a qualified exemption from the provisions of Part II applicable to

motor vehicles used in carrying property consisting of livestock by limiting the exemption to the carriage of ordinary livestock."

Senate Report No. 2016 of April 26, 1940, to accompany S. 2009 is almost identical in this respect to the House Report No. 2832 set out above. Congress rejected the first amendment referred to. It enacted the second amendment referred to on September 18th, 1940. That amendment, which inserted the word "ordinary" in front of the word "livestock" in Section 203(b)(6), has been previously discussed.

On November 7, 1940, the Interstate Commerce Commission handed down its first opinion in the case involving the Monark Egg Corporation, Contract Carrier Application; No. M.C. 89207. Division 5. Reported in 2 Federal Carrier Cases 109 and 26 M.C.C. 615. The case had to do with the question as to whether certain types of fish, and also oysters, were within the exemption. That case will be discussed in detail later.

Also in 1940 the case of U. S. v. Chadwick, D.C.E.D.Pa.1940, 39 F.Supp. 204 was decided. While there was a question of whether poultry feed, sauerkraut, and peas were exempt commodities, the case was decided on the basis of the sufficiency of the indictment. The Court did not go into the question here involved.

On September 16, 1941, the Interstate Commerce Commission decided the case of Lester C. Newton Extension of Operations —Frozen Food, No. M.C.-743 (Sub.-No. 2) 43 M.C.C. 787. The applicant sought a certificate of public convenience and necessity as a common carrier to transport frozen agricultural commodities and frozen sea foods on the East Coast. The certificate was granted. The majority decided that the frozen agricultural commodities were not within the exempt provisions of Section 203(b)(6) and therefore a permit was necessary to haul them. At page 789 it was stated: "* * * It is clear that agricultural commodities, frozen in the manner hereinabove described, are subjected to a process of manufacture, and that the finished products are as distinct from agricultural commodities as are

canned fruits and vegetables, from which both are manufactured. * * * We conclude that fresh frozen fruits and vegetables are 'manufactured products' as that term is used in section 203(b) (6) of the act, and that the transportation of such commodities is subject to the certificate or permit requirements of part II of the act." The Commission did not pass on the question of whether frozen sea foods came within the term "fish (including shell fish)" as used in the exemption provision of Section 203(b)(6).

Commissioner Lee concurred in part but thought the proposed operations fell within the exemption of Section 203(b)(6). He stated, in part, at pages 793 and 794:

"* * * It may be that, in their frozen state, some foods will be so changed in character and appearance as to remove them from the description 'agricultural commodities (not including manufactured products thereof).' I am satisfied, however, that frozen fruits and vegetables which are not substantially changed in character or appearance and to which nothing has been added other than possibly a preservative, are not manufactured agricultural commodities and that they do fall within the exemption. I have no doubt whatsoever that frozen sea food is included within the term 'fish (including shell fish).'"

Commissioner Lee differed with the majority on the question of the effect of hauling non-exempt commodities on the same vehicle on which exempt commodities are hauled, although at a different time. The majority took the view that the vehicle was the test, so that the hauling of non-exempt commodities at any time destroyed the exemption altogether for that vehicle. Commissioner Lee took the view that the test was what product was being hauled at any one time, and what was hauled at another time was immaterial.

In 1942 a bill, S. 975, was introduced into the 77th Congress, 2d Session, on April 27, 1942. 88 Congressional Record 3712. In substance it would have amended Section 203(b)(6) to include horticultural products. That bill was not enacted.

Later, as hereafter noted, Congress did include horticultural products within the provisions of Section 203(b)(6).

In 1942 the case of U. S. v. Krinvic Bros., D.C.E.D.Pa.1942, 47 F.Supp. 481, 482, was decided. While there was a question in the case as to whether "fish scrap and King Crab Meal" were exempt agricultural commodities, the case was decided on the sufficiency of the information. The Court did not go into the question here involved.

In 1943 a bill, S. 1148, was introduced in the 78th Congress, 1st Session, on May 28th (Legislative Day, May 24th) by Senator Lodge. The bill would have amended Section 203(b)(6) of the Motor Carrier Act to read as follows: "(6) Motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof), *by the producers of such property or by private carriers of property by motor vehicle,* if such vehicles are not used in carrying *such property or* any other property, or passengers, for compensation." The bill was referred to the Committee on Interstate and Foreign Commerce. It never became law.

This proposed amendment would have changed the existing language of the Act by the insertion of the italicized words of the quotation and by the deletion of the word "motor" preceding the word "vehicles" and following the word "such" in that part of the quotation immediately following the first italicized words.

The effect would have been to limit the exemption to the actual producer or to those hauling without compensation. It would have effectively eliminated the exemption in favor of commercial truckers contained in subparagraph (b) (6).

On October 2, 1944, the Interstate Commerce Commission handed down its second opinion in the Monark Egg Corporation, Contract Carrier Application; No. M.C. 89207, Division 5, reported in 4 Federal Carriers Cases 310 and 44 M.C.C. 15. In substance the Commission followed its former opinion. That case will be discussed in detail later.

In 1948 the decision in the case of Interstate Commerce Commission v. Dunn, 5 Cir., 1948, 166 F.2d 116, 117, was handed down. The issue in the case was the proper construction of the phrase in Section 203(b)(6) of the Motor Carrier Act "* * * if such motor vehicles are not used in carrying any other property, or passengers, for compensation." The defendant was engaged in the interstate hauling of baled cotton, an admittedly exempt commodity, part of the time and non-exempt commodities at other times. The Court held the exemption applied while hauling the exempt commodities regardless of what was hauled at other times. This, in effect, established that the commodity being hauled, and not the vehicle used, is the test of the exemption. In that case the Secretary of Agriculture appeared as amicus curiae and opposed the contentions of the Interstate Commerce Commission. In that case the Court discussed the matter of administrative interpretation of the portion of the Section involved. In connection with that matter, a decision of the Interstate Commerce Commission had been cited. The Court, 166 F.2d at page 117, stated: "We are referred to only one decision, * * *. This decision does not show a settled construction by the Commission entitled to great weight. Even if there be such, we may not follow it if clearly wrong." Commenting on the Interstate Commerce Commission's interpretation of the exemption contained in 203(b)(6), the Court stated, 166 F.2d at page 118:

"* * * This construction also makes war on the very interstate transportation which the exemption was plainly intended to foster and encourage. It is its purpose to free the transportation interstate of the favored commodities, particularly agricultural products, from the general regulation of interstate commerce by the Commission except as to fitness of drivers and trucks. A like favor has been shown to agricultural commodities in numerous other Acts of the period. To get a certificate or permit from the Commission involves much delay, incon-venience and expense, and often disappointment. Relief from this is offered in order to aid the prompt and free transportation of the named commodities, which transportation is usually seasonal and intermittent, but often urgent because it is of perishables, as fruits, vegetables and fish. * * *"

The case of Interstate Commerce Commission v. Love, D.C.E.D.La.1948, 77 F.Supp. 63, affirmed memorandum opinion, 5 Cir., 1949, 172 F.2d 224 was also decided in 1948. The issue was whether headless shrimp were within the scope of the exemption contained in Section 203(b)(6) of the Motor Carrier Act. The Interstate Commerce Commission claimed they were not. The Court held that they were. In discussing the Interstate Commerce Commission interpretation of the exemption in question, the Court stated, 77 F.Supp. at page 67 of the opinion:

"* * * If the Commission's holdings were followed, they would nullify the exemption accorded motor vehicles transporting shrimp, by virtue of the shrimp being beheaded, because no shrimp are transported to the market which are not beheaded. In this way, and through such an interpretation, the Commission has given no effect whatever to the exemption provided in the statute for fish, insofar as it affects the transportation of shrimp."

On the question of the weight to be given to the Commission's interpretation of the statute, the Court stated, 77 F.Supp. commencing at page 67:

"The court concludes that the Commission's construction of the statute is clearly erroneous and that a different construction is plainly required by the words of the Act. Consequently the rule that the contemporaneous construction of a statute by those charged with its execution is entitled to great weight and should not lightly be overturned, does not apply."

Following the decision in the Love case, supra, the Monark Egg case was reopened for oral argument on the question of what fish and associated products would be with-

in the exemption of Section 203(b) (6) in light of the Love decision. This proceeding was application number M.C.–89207. The opinion therein was rendered on September 23, 1949, and was reported in 49 M.C.C. 693. This is known as the third Monark Egg case. In substance, in that opinion the Interstate Commerce Commission reversed its first and second opinions. That case will be discussed in detail later.

On March 30, 1950, bill number H. R. 7547 was introduced in the 81st Congress, 2d Session, by Mr. Kilday. It proposed that Section 203(b) (6) of the Motor Carrier Act be amended to read as follows:

"(6) Motor vehicles used in carrying property consisting of ordinary livestock, live poultry, and other agricultural commodities (not including the products of slaughter, nor preserved, frozen, or unmanufactured products), and fish (including shell fish but not including preserved, frozen, processed, or manufactured products), if such motor vehicles.are not used in carrying any other property, or passengers, for compensation; or"

This bill was referred to the House Committee on Interstate and Foreign Commerce but was never reported out of committee. It would have severely limited the exemption by excluding all commodities that were slaughtered, frozen, preserved or processed.

The case of Interstate Commerce Commission v. Weldon, D.C.Tenn.1950, 90 F.Supp. 873 was decided in 1950. The issue was whether raw shelled peanuts were an agricultural commodity within the scope of Section 203(b) (6) of the Motor Carrier Act. The Court held that they were not within the exemption. The holding was based on the first and second Monark Egg cases, supra, and special emphasis was placed on the channel of commerce theory as advanced in the first and second Monark Egg cases, i. e., as soon as a product gets into the regular channels of commerce it is outside the exemption. The Court took the view that the exemption was to be strictly construed to effect a liberal construction of the main Act. On the question of the weight to be given the administrative interpretation

of the Act, the Court stated, 90 F.Supp. at page 877:

"The contemporaneous constructions placed upon the provisions of the Interstate Commerce Act by the Commission which possesses special competence in this field, are entitled to great weight and respect and will not be overturned unless they are arbitrary or plainly erroneous."

The case was affirmed upon the grounds and for the reasons set forth in the memorandum opinion of the District Court. Weldon v. Interstate Commerce Commission, 6 Cir., 1951, 188 F.2d 367.

The case of Interstate Commerce Commission v. Service Trucking Co., D.C.Pa. 1950, 91 F.Supp. 533 was decided in 1950. The question was very similar to that raised in the case of Interstate Commerce Commission v. Dunn, supra. The Court held that an interstate trucker was exempt while hauling eggs one way, eggs clearly being an exempt commodity, even though he hauled non-exempt commodities on the return load. The Court stated, 91 F.Supp. at page 534, " * * * I am satisfied that the exemption applies unless the carrier who transports exempt commodities also transports nonexempt products at the same time in the same vehicle." The commodity that was being hauled on the return load was dressed poultry but the Court did not decide whether it was an exempt commodity.

The Court discussed several rules of statutory construction. At page 535 of 91 F.Supp. it stated:

" * * * Whatever the exact import of the Commission's rulings, implied adoption of judicial construction upon the reenactment of a statute is but one factor in the total effort to give fair meaning to statutory language. Federal Communications Commission v. Columbia Broadcasting System, 311 U.S. 132, 61 S.Ct. 152, 85 L.Ed. 87, and, of course, the same is true of reenactment after administrative construction."

At page 535 of 91 F.Supp. the Court also stated:

"The Court in the Dunn case was undoubtedly aware of the rule for strict construction of exemptions and reached its conclusion nevertheless. The rule will not be applied to the extent of requiring an interpretation contrary to what appears to be the intent of the law."

The Court discussed the weight to be accorded administrative rulings at page 535 of 91 F.Supp:

"The Commission relies primarily upon a course of administrative rulings in which the Commission required carriers, in the same situation as this defendant, to get operating authority. I recognize the rule of statutory interpretation which accords great weight to the rulings of regulatory bodies, but it seems to me that where the question is one not wholly dependent upon matters within the expert, technical or statistical field in which the regulatory body is preeminently qualified to judge, but which primarily involves jurisdiction, the force of the administrative rulings is less than it would otherwise be. The same argument was considered by the Court in the Dunn case, which was decided February 5, 1948. The Court doubted that there was such a settled construction by the Commission as would be entitled to great weight but went on to say 'Even if there be such, we may not follow it if clearly wrong.' "

The decision was affirmed on appeal. Interstate Commerce Commission v. Service Trucking Co., (3 Cir., 1951) 186 F.2d 400. The opinion on appeal was very similar to that in the trial court. At page 402 of 186 F.2d the Court stated: "We think the Commission decisions interpreting 203(b) (6) of the Act are clearly wrong." It cited with approval the statement from Interstate Commerce Commission v. Dunn, supra, which was critical of the Interstate Commerce Commission's interpretation of the exemption contained in Section 203(b) (6) of the Act. At page 402 of 186 F.2d the Court stated in regard to the interpretation claimed by the appellant Interstate Commerce Commission:

"We agree, however, that the interpretation sought by appellant ' * * * is so unreasonable and so crippling * * * to the free interstate carriage of the privileged commodities, and even contrary to the general policy of the legislation, that it cannot be the true legislative intent.' "

As a proper construction of the exemption contained in Section 203(b) (6) of the Act, the Court stated 186 F.2d at page 402, it agreed with that placed on it by Commissioner Lee in his dissenting opinion in the second Monark Egg case, supra.

On April 13, 1951, the Interstate Commerce Commission handed down its findings in No. M.C.–C–968, Determination of Exempted Agricultural Commodities and as a part of the same report, No. M.C.–107669, Norman E. Harwood Contract Carrier Application. The entire report is cited as 52 M.C.C. 511. The scope and purpose of this report can be gathered from a statement made on pages 2 and 3 of the report:

"The title proceeding is an investigation instituted on our own motion into and concerning the meaning of the term 'agricultural commodities (not including manufactured products thereof)' as used in section 203(b) (6) of the Interstate Commerce Act. Upon consideration of petitions filed by the Secretary of Agriculture, and jointly by the Atlantic Commission Co., Inc., and others by a concurrent order, we reopened No. M.C.–107669, Harwood Contract Carrier Application, 47 M.C. C. 597, hereinafter called the Harwood case, for further hearing on a consolidated record with the investigation proceeding.

"Representatives of the United States Department of Agriculture and a large number of States, agricultural marketing associations, farmer organizations, shippers, growers, and other interested parties appeared and submitted evidence. A number of rail and motor carriers also appeared but only one presented any affirmative evidence. Neither the applicant in the Harwood case nor anyone in his be-

half appeared at the further hearing in that proceeding."

In this proceeding it was decided that the Harwood application be denied for a failure to establish that he was willing and able to conduct the proposed operation. With reference to the Harwood case the Interstate Commerce Commission stated at page 69 of its report:

"There remains for consideration, the application in No. M.C.–107669 (the Harwood case). As stated in the prior report in that proceeding, the need there found to be existing for Harwood's proposed service was for the transportation of fresh fruits and vegetables and processed fresh vegetables (including those chopped up), from and to described points and areas. In view of our conclusions herein that chopped-up vegetables do not come within the partial exemption, a permit is required at least with respect to that portion of the operation proposed. As previously stated, however, neither applicant nor anyone in his behalf appeared at the further hearing in the Harwood proceeding. In the circumstances, it appears that applicant, Norman E. Harwood, is no longer interested in his application. Accordingly, we shall deny the application."

The findings of the Interstate Commerce Commission pertinent to the question here involved were as follows:

"In No. M.C.–C–968, we find that the term 'agricultural commodities (not including manufactured products thereof)' as used in section 203(b)(6) of the Interstate Commerce Act means: Products raised or produced on farms by tillage and cultivation of the soil (such as vegetables, fruits, and nuts); forest products; live poultry and bees; and commodities produced by ordinary livestock, live poultry, and bees (such as milk, wool, eggs, and honey), but not including any such products or commodities which, as a result of some treatment, have been so changed as to possess new forms, qualities, or properties, or result in combinations.

"We find that the term 'agricultural commodities (not including manufactured products thereof)' as used in section 203(b)(6) includes: (1) fruits, berries, and vegetables which remain in their natural state, including those packaged in bags or other containers, but excluding those placed in hermetically sealed containers, those frozen or quick frozen, and those shelled, sliced, shredded, or chopped up; (2) fruits, berries and vegetables dried naturally or artificially; (3) seeds, including inoculated seeds, but not seeds prepared for condiment use or those which have been deawned, scarified or otherwise treated for seeding purposes; (4) forage, hay, straw, corn and sorghum fodder, corn cobs, and stover; (5) (a) hops and castor beans, and (b) leaf tobacco, but excluding redried tobacco leaf; (6) raw peanuts, and other nuts, unshelled; (7) whole grains, namely, wheat, rye, corn, rice, oats, barley and sorghum grain, not including dehulled rice and oats, or pearled barley; (8)(a) cotton in bales or in the seed, (b) cottonseed and flaxseed, and (c) ramie fiber, flax fiber, and hemp fiber; (9) live poultry, namely chickens, turkeys, ducks, geese and guineas; (10) milk, cream, and skim milk, including that which has been pasteurized, standardized milk, homogenized milk and cream, vitamin 'D' milk, and vitamin 'D' skim milk; (11) wool and mohair, excluding cleaned and scoured wool and mohair; (12) eggs, including oiled eggs, but excluding: whole or shelled eggs, frozen or dried eggs, frozen or dried egg yolks, and frozen or dried egg albumin; (13)(a) trees which have been felled and those trimmed, cut to length, peeled or split, but not further processed, and (b) crude resin, maple sap, bark, leaves, Spanish moss, and greenery; (14) sugar cane, sugar beets, honey in the comb, and strained honey.

"In No. M.C.–107669, on further hearing, we find that applicant has failed to establish that he is willing and

able to conduct the proposed operation; and that the application should be denied.

"There are differences of opinion among the members of the Commission with respect to whether certain of the commodities named in the findings in the title proceeding are agricultural commodities within the meaning of section 203(b)(6) of the act, but to the extent that the commodities named therein are found to fall within the exemption the finding with respect to each commodity or group of commodities has the approval of a majority of the Commission although not the same majority in all instances.

"An appropriate order will be entered discontinuing the proceeding No. M.C.–C–968, and denying the application in No. M.C.–107669."

Commissioner Lee concurred in part but was of the view the majority report construed the agricultural exemption too narrowly. He stated at p. 75 of the report:

"It is my considered opinion that the following are agricultural commodities and as such fall within the partial exemption provided in section 203(b)(6):

"Fruits, berries and vegetables which have been shelled, sliced, shredded, chopped up, or frozen or quick frozen, with the possible exception of those which in their frozen state are substantially changed in character and appearance.

"Seeds which have been deawned, scarified, or otherwise treated for seeding purposes.

"Redried tobacco leaf.

"Shelled raw peanuts and other shelled raw nuts.

"Dressed and cut-up chickens, turkeys, ducks, geese and guineas.

"Cleaned and scoured wool and mohair.

"Shelled and frozen eggs."

Commissioner Patterson concurred in this result.

Commissioner Rogers dissented on the theory that the majority opinion's view of the exemption was too broad and that it should be limited to the farmer alone and then to the point where the commodity first enters the regular channel of commerce. Commissioner Cross concurred in this dissent. Commissioner Johnson also dissented. Commissioners Mitchell and Knudson took no part in these proceedings.

An examiner of the Interstate Commerce Commission had heard the evidence and had made his findings as to what commodities were exempt under the Act. As to the findings of that examiner in regard to the poultry and livestock groups, it was stated at page 52 of the Report:

"The examiner concluded that the following are unmanufactured agricultural commodities: (1) chickens, turkeys, ducks, geese, and squab, alive or killed, picked, drawn, cut-up, frozen or unfrozen; (2) feathers, hackles, quills, and down from ducks and geese; and (3) eggs, including whole eggs and oiled eggs, but excluding frozen or dried eggs, and frozen or dried egg yolks and albumin."

Without any further evidence having been introduced the majority of the Commission rejected this finding as follows:

" * * * But slaughtered animals are not embraced in the definition of ordinary livestock and we are impelled to conclude that the products thereof, such as fresh meat and meat products, do not fall within the description 'agricultural commodities' as used in section 203(b)(6). It logically follows that neither killed poultry nor any products thereof come within the term under consideration. We conclude that poultry other than that alive is not an agricultural commodity within the meaning of Section 203(b)(6). Further, we are of the opinion that birds of the air such as doves and pigeons are not agricultural commodities."

The majority opinion therein discussed, on pages 18, 19, and 20 of the Report, the applicability of the channel of commerce theory, and in connection therewith the breadth of the exemption contained

in Section 203(b)(6). The discussion is as follows:

"The partial exemption contained in section 203(b)(6) is directed to the motor vehicles, not to the transportation of 'agricultural commodities (not including manufactured products thereof).' There is no limitation as to the points from and to which the motor vehicles may be operated. Although the object of the partial exemption as originally framed was to aid the farmer in marketing his products, the substitution of the present language for the words 'unprocessed agricultural products' clearly resulted in a broadening of the exemption. That this is so was made plain by the chairman of the subcommittee sponsoring the amendment when he stated that pasteurized milk and ginned cotton were intended to come within the partial exemption. He also indicated that cottonseed would fall within the exemption. It must be assumed that Congress was familiar with the practices obtaining in the industry incidental to the marketing of these and other agricultural commodities. As hereinafter shown, the uncontradicted evidence in this respect is that the pasteurization, among other processing, and bottling of milk for sale to consumers, is customarilly (sic) done at dairies in the larger cities throughout the country, and that the bulk of the cotton seed is sold by the farmer to the ginners. In the light of these practices and the clear intent of Congress that pasteurized milk was to be included in the partial exemption, irrespective of the fact that the milk was processed after entering the ordinary channels of commerce, or that the cottonseed was sold to the ginner, it is difficult to conclude that Congress intended that other agricultural commodities, processed (but not manufactured) or packaged for consumer use, regardless of ownership, should be treated differently. Moreover, to hold that the place at which the commodities are predominantly processed or packaged is controlling of the applicability of the partial exemption would, in many instances, prevent the movement by exempt vehicle of items processed or packaged by farmers themselves, a result obviously not intended by Congress.

"Certain of the exceptants contend that by amending the original phraseology of the partial exemption, Congress intended to broaden the exemption only to the extent of including therein pasteurized milk, ginned cotton, and cottonseed. If such a result had been intended Congress could simply have added the three named commodities after the words 'unprocessed agricultural products'. We think the commodities mentioned were intended to be illustrative of the types of processing permissible under the partial exemption as now phrased.

"It is significant that in other subparagraphs of section 203(b), Congress specifically limited the operations of exempt motor vehicles. For example, section 203(b)(1) applies to 'motor vehicles employed solely in transporting school children and teachers to or from school;' section 203(b)(3) relates to 'motor vehicles owned or operated by or on behalf of hotels and used exclusively for the transportation of hotel patrons between hotels and local railroad or other common carrier stations', section 203(b)(4a) applies to 'motor vehicles controlled and operated by any farmer when used in the transportation of his agricultural commodities * * *'; and section 203(b)(5) concerns 'motor vehicles controlled and operated by a cooperative association * * *'. In light of the foregoing limitations imposed upon the operations of the particular exempt motor vehicles, and the failure of Congress similarly to limit exempt motor vehicles carrying 'agricultural commodities (not including manufactured products thereof)', the argument advanced by exceptants that the partial exemption of section 203(b)(6) applies only to exempt motor vehicles carrying unmanu-

factured agricultural commodities from the farm to the point where they enter the ordinary channels of commerce is without merit.

"Certain of the certificated motor carriers, exceptants herein, transport under appropriate authority such commodities as shelled raw peanuts and dressed poultry, heretofore found by division 5 to be without the partial exemption. They fear that a reversal of these prior decisions would result in irreparable damage to them through the loss of a considerable portion of their traffic to operators of exempt motor vehicles, and contend that by its failure to amend section 203(b) (6), at least since the issuance of the second report in the Monark Egg Case, Congress by implication must be considered to have acquiesced in the interpretation placed thereon by division 5. In the Love Case, a similar contention made by us in respect of the interpretation by division 5 of the term 'fish (including shell fish)' as used in section 203(b) (6), was rejected by the court. We are here concerned only with the meaning of the words 'agricultural commodities (not including manufactured products thereof)' as used in section 203(b) (6). Inconvenience or hardships, if any, that result from following a proper interpretation of the statute can be relieved only by Congress. We conclude that the 'channel of commerce' principle is not appropriate for use in determining the applicability of the partial exemption."

Also on April 13, 1951, the fourth opinion in the Monark Egg case was handed down. Monark Egg Corporation Contract Carrier Application, No. M.C.-89207, 52 M.C.C. 576. The Interstate Commerce Commission affirmed its holding in its third opinion. That case will be discussed in detail later.

On April 3, 1952, the case of Interstate Commerce Commission v. Yeary Transfer Co., Inc., D.C.Ky.1952, 104 F.Supp. 245 was decided. The Secretary of Agriculture appeared in that case as amicus curiae. The Court in that case held redried tobacco

was an agricultural commodity within the exemption contained in Section 203(b)(6). This holding was affirmed without opinion, 6 Cir., 1953, 202 F.2d 151. The particular commodity, redried leaf tobacco, had been found to be an exempt agricultural commodity by the examiner in the *Determination* proceeding but his finding had been reversed by the Interstate Commerce Commission and the majority of that Commission held it to be a manufactured article. The Court reached the same result as the examiner and disagreed with the Interstate Commerce Commission holding in the *Determination* case on the status of redried tobacco. No direct reference to the *Determination* proceeding was made.

Several rules of statutory construction were discussed by the Court at page 247 of 104 F.Supp. as follows:

"The rule of strict construction of exemptions upon which plaintiff relies should not be applied to the extent of requiring a result contrary to the clear intent of the law. Neither should the rule attributing great weight to contemporaneous administrative rulings be applied to require the Court to follow such rulings when they are found to be clearly wrong."

The contention was apparently made in this case that the defendant's defense that redried tobacco came within the agricultural exemption was a collateral attack upon an order of the Interstate Commerce Commission. In that regard the Court stated on page 247 of 104 F.Supp:

"The facts set out in paragraphs 7 and 8 of the stipulation and the exhibits attached thereto are insufficient to render the defense herein asserted by the defendant a collateral attack upon an order of the Commission or to preclude assertion of such defense in this action."

On July 9, 1952, the Motor Carrier Act, Section 203(b)(4a) and (6) were amended by passage of the bill S. 2357 which inserted the words "including horticultural" after the word "agricultural" in each of said Sections. The bill, S. 2357, as originally introduced, as well as several amendments in the nature of substitutes, would

have limited the scope of the exemptions provided by subparagraph (6) here involved. Senate Report No. 1615 of May 29, 1952, 82d Congress, 2d Session, which accompanied S. 2357, makes that clear. At page 2 of said Report it is stated:

"As originally introduced, S. 2357 would have restricted the use of the agricultural exemption to motor vehicles controlled or operated by the farmer.

"As amended, the bill leaves untouched the present language of sections 203(b)(4a) and 203(b)(6) of the Interstate Commerce Act except to make it clear that the term 'agricultural commodities' includes 'horticultural commodities' such as nursery stock, flowers, and bulbs."

S. 2357 was originally introduced by Senator Johnson of Colorado (by request) on January 10, 1952. As introduced, it was proposed that 203(b)(4a) be changed to read as follows:

"(4a) Motor Vehicles controlled and operated by any farmer, (i) transporting supplies to his farm, or (ii) transporting ordinary livestock as defined in section 20(11) of this Act, or agricultural commodities (not including livestock or commodities which have been processed to a greater extent than is customarily done by farmers) prior to their marketing by the farmers raising or producing such livestock or commodities, if such motor vehicles are not used at the same time or on the return trip or customarily in any other kind of transportation for compensation; or"

Section 203(b)(6) would have been changed to read as follows:

"(6) Motor vehicles transporting unprocessed fish (including shell fish) to market for the fisherman catching such fish, if such motor vehicles are not used at the same time or the return trip or customarily in any other kind of transportation for compensation; or"

One "amendment," in the nature of a substitute for S 2357, proposed that 203 (b)(6) be changed to read as follows:

"(6) the transportation of property consisting of ordinary livestock (including poultry), whole fresh fish (including shell fish), or agricultural commodities (not including manufactured products thereof), in the first movement from the point of production to the point of sale by the producer, or to the point of manufacture or transshipment; the point of production for fish shall mean the wharf or other landing place at which the fisherman debarks his catch, the point of production for livestock or agricultural products shall include the point at which they are gathered for initial shipment to the point of first sale, manufacture, or transshipment, and the point of first sale shall not be deemed to include the point of production; or".

Another proposed amendment in the nature of a substitute for S. 2357 would have changed 203(b)(4a) to read as follows:

"(4a) the transportation by motor vehicle for compensation, from farm to market, or to the point of first off-the-farm processing, or to storage, of ordinary livestock, nursery stock, or other agricultural commodities (not including manufactured products thereof); or".

It would have also changed 203(b)(6) to read as follows:

"(6) the transportation by motor vehicle for compensation, from wharves or other landing places at which fishermen debark their catch, to market or to the first point of processing, or to storage, of fish (not including manufactured products thereof); or".

In connection with this same 1952 legislation, extensive hearings were held before a Senate Sub-Committee. Mr. Idol, General Counsel of the American Trucking Assoc., Inc., made the following statement in respect to S. 2357 as originally introduced while testifying before the said Sub-Committee:

"I think our principal point on this particular language used in the bill before us is that it eliminates completely any exemption with respect to any transportation not performed by a

farmer. You would have no exemption whatever, even in the area between point of production and the initial market, which it would seem to me is impracticable in many cases and very expensive with respect to enforcement."

Page 374, Hearings Before the Committee on Interstate and Foreign Commerce United States Senate, 82d Congress, 2d Session, (1952). After the passage of the 1952 amendment, which inserted the words "including horticultural", the case of Florida Gladiolus Growers Ass'n v. U. S., D.C.S.D.Fla. 1952, 106 F.Supp. 525 was decided. That Court held cut gladiolus and gladiolus bulbs were agricultural commodities within the exemption of Section 203(b) (6). The Court stated that the 1952 amendment merely declared the prior law. At page 526 of 106 F.Supp. it stated:

"Although the institution of this suit antedated the passage of the statute above mentioned, the statute is merely declaratory of the general law as it existed when suit was brought. The courts have long defined the term 'agriculture' to include horticulture, which embraces, amongst other things, the raising and culture of nursery stock. * * *"

The Court discussed the decision in the 1951 Interstate Commerce Commission *Determination hearing, supra,* which had held nursery stock, flowers and bulbs were not within the exemption of Section 203(b) (6) and rejected that conclusion.

On January 12, 1953, the United States Supreme Court handed down its decision in the case of American Trucking Associations, Inc., v. United States, 344 U.S. 298, 73 S.Ct. 307, heretofore referred to, in which the rules of the Interstate Commerce Commission relating to leasing and exchange of equipment were held valid.

On March 25, 1953, the Interstate Commerce Commission decided the case of In re William Blaue, heretofore referred to, relating to the so-called "newspaper exemption."

On May 4, 1953, the United States District Court for the Eastern District of Pennsylvania held that scoured wool came within the exemption of Section 203(b)(6). Interstate Commerce Commission v. Wagner, 112 F.Supp. 109.

No other pertinent decisions or material bearing upon the exemption provisions of the Act, other than those referred to herein, have been cited by counsel or found.

Counsel for the Interstate Commerce Commission place some stress upon the case of Interstate Commerce Commission v. Weldon, D.C.W.D.Tenn.1940, 90 F.Supp. 873, affirmed, 6 Cir., 1951, 188 F.2d 367, heretofore referred to, in which raw shelled peanuts were held not to be within the exemption. Counsel for the defendant and the Secretary of Agriculture assert that whatever pertinency that decision may have to the question here under consideration, its authority has been greatly weakened by subsequent holdings. They point out that the court holding in that case was based upon the holdings in the first and second Monark Egg Corporation cases, supra, and the channel of commerce theory upon which they were based, and that in the third and fourth Monark Egg Corporation cases the Interstate Commerce Commission reversed its holdings in the first and second of these cases and that the Interstate Commerce Commission subsequently abandoned the channel of commerce theory so far as the agricultural exemption was concerned. They also point out that the later case of Interstate Commission v. Woodall Products Co., Inc., D.C. Ky.1952, 104 F.Supp. 245, affirmed, 6 Cir., 1953, 202 F.2d 151 which held that redried tobacco was within the exemption was also a Sixth Circuit case and that it is contrary in theory to the earlier Weldon case in the same Circuit. Counsel stated that there are no court decisions in which the question of dressed poultry being within the exemption has been directly passed upon. In the case of Interstate Commerce Commission v. Woodal Products Co., Inc., D.C. N.D.Ga.1953, 112 F.Supp. 639, the defendant was hauling dressed poultry in interstate commerce by motor vehicles. It did not have a certificate or permit from the Interstate Commerce Commission. The Interstate Commerce Commission sought

to enjoin it from engaging in such hauling until it secured either a certificate of public convenience or necessity as a common carrier or a permit as a contract carrier. The defendant set up two defenses. Its first defense was that it was a private carrier engaged in transporting dressed poultry owned by it and that by virtue of Section 303(a) (17), Title 49 U.S.C.A., it was not required to secure either a certificate or a permit. Its second defense was that dressed poultry was an exempt commodity under the provisions of Section 303(b) (6), Title 49 U.S.C.A. The Court held that the defendant had sustained its first defense and did not pass upon the question as to whether dressed poultry was an exempt commodity under the provisions of Section 303(b) (6). Other than the cases referred to herein, no cases have been cited or found construing the provisions of the agricultural exemption. None of the cases referred to herein relating to the provisions of the agricultural exemption are particularly in point or of helpful assistance on the question here involved. Therefore, the matter of administrative interpretation and legislative history needs to be considered.

In the written brief filed by the Interstate Commerce Commission it was claimed that the defendant in this proceeding was collaterally attacking an order of the Commission. In oral argument counsel for the Commission stated that upon further consideration they were of the view that the matter of such attack is not involved in this case. They also stated that this action does not involve the delegated rule making, or so-called legislative power, of the Commission, but what is involved, among other matters, is administrative construction or interpretation. The parties devoted a substantial portion of their briefs and oral argument to the matter of administrative construction or interpretation.

■ The law is well settled that the interpretation placed upon a statute by an administrative agency entrusted with responsibility in a particular field by Congress is entitled to great weight. The construction placed by the Interstate Commerce Commission on a statute which it is charged with enforcement of is entitled to great weight and is not lightly to be interfered with by the courts. New York, New Haven & Hartford R. Co. v. Interstate Commerce Commission, 1905, 200 U.S. 361, 401, 402, 26 S.Ct. 272, 50 L.Ed. 515. In the recent case of Dart Transit Co. v. Interstate Commerce Commission, D.C.Minn. 1953, 110 F.Supp. 876, affirmed by the United States Supreme Court June 15, 1953, 345 U.S. 980, 73 S.Ct. 1138, Circuit Judge John B. Sanborn, speaking for a three-judge court, stated at page 880 of 110 F.Supp.: "In the interest of uniformity in the regulation and policing of the motor carrier industry, it is of course essential that the Commission be subjected to as little * * * interference as the law will permit."

It is the claim of the Interstate Commerce Commission that its official interpretation of Section 203(b) (6) has been that dressed poultry does not come within its provisions. In that connection it refers to the Frank Battaglia Common Carrier Application, 18 M.C.C. 167 (1939) and its statements in the first and second Monark Egg cases. In the first Monark Egg case, 26 M.C.C. 615 (1940), the Commission had under consideration an application of the Monark Egg Corporation for a certificate permit as a contract carrier to transport fresh and frozen fish, fillets of fish, and also oysters. The Corporation claimed that its operations were within the exemption of Section 203(b) (6) and that its application was made for purposes of clarification. The Commission denied the application. The Corporation did not make application for authority to transport dressed poultry. The Commission noted that some of the Corporation's trucks were so used and in connection with its ruling on fish and oysters stated, "Dressed poultry does not come within the term livestock * * *." The Commission reopened the case and handed down the opinion known as the second Monark Egg case opinion, 44 M.C.C. 15 (1942). In that opinion the Commission stated that dressed poultry was a "manufactured product" and not within the exemption. The Commission stated at p. 18 of 44 M.C.C.:

"The legislative history indicates that the benefits of the exemption were intended for the farmer by affording relief in the transportation of his products to the point where they first enter the ordinary channels of commerce."

This statement is the so-called "channel of commerce" theory which was later abandoned by the Commission. In its opinion the Commission stated on page 17 of 44 M.C.C. that the words "manufactured products thereof" used in Section 203 (b) (6) related only to "agricultural commodities" and not to "fish" or "ordinary livestock." It appears from a footnote to the opinion that "fillet is the meat, free of fins, most of the bones and other waste material, as taken from the two sides." It was the holding of the Commission that only fish as taken from the water had the status of fish under Section 203(b) (6). In the case of Interstate Commerce Commission v. Love, D.C., 1948, 77 F.Supp. 63, supra, it was held that headless shrimp were within the exemption provisions of Section 203(b) (6). In the Senate Committee Report under S. 50, on pages 814–825, there appears a legislative history of Section 203(b) (6) prepared by David G. MacDonald who appeared as counsel for certain certificated carriers in opposition to the liberalization of the provisions of Section 203(b) (6). In that legislative history, at p. 825 of said Report, the following appears relating to the decision in the Love case:

"The result of this decision, then, was to overturn nearly 15 years of administration of the act by throwing into the exempt category many commodities which had been considered nonexempt * * * The Commission appealed the case but lost it in the circuit court (172 F.2d 224), * * * On April 11, 1949 after the appeal in the Love case had failed, the Commission reopened the Monarch (sic) case, supra, to render its decision as to the meaning of 'fish' * * * in the light of the decision in that case. It found that the phrase includes: 'Frozen, quick frozen and unfrozen fish in the various forms in which it is shipped, such as * * * beheaded and gutted fish, filleted fish, beheaded shrimp, * * * In summary then, the original interpretation of the Commission * * * has been overturned. As a substitute the liberal interpretation now applied, extended to its logical conclusion, has removed from regulation the transportation of all edible fishery products—the Commission's reservations as to canned and preserved fish will not survive if put to a judicial test. Dressed poultry, fresh meats, and other products are in line for the same treatment."

The decision in the Monark Egg case of April 11, 1949, is known as the third Monark Egg case opinion, 49 M.C.C. 693. The Interstate Commerce Commission then reopened the Monark Egg Company case for further arguments. It was reopened upon the application of certain intervenors who claimed that the opinion of the Commission in the third case gave too broad an interpretation to the word "fish" in Section 203(b) (6). On April 13, 1951, the Commission handed down another opinion in the case. 52 M.C.C. 576. It is known as the fourth opinion in the Monark Egg case. In that opinion it was stated that the Secretary of Agriculture was in general accord with its third opinion in the case. The Commission adhered to the interpretation given by it in the third opinion. On page 579 of 52 M.C.C., the last opinion, the Commission states: "The beheading, gutting, or filleting of fish or the removal of the shell from shellfish does not cause any of the fish or shellfish to be any of the less such. They continue to be fish or shellfish in their natural state * * *." On page 581 of 52 M.C.C. the Commission stated that it had rejected the "channel of commerce" principle.

On April 13, 1951, the Commission handed down its report in the Determination of Exempted Agricultural Commodities, No. M.C.-C.-968, 52 M.C.C. 511, heretofore referred to.

The defendant and the Secretary of Agriculture question whether the statements made by the Commission in the first and second Monark Egg Corporation cases

should now be regarded as having the status of an interpretation by the Commission on the question here involved. In the first Monark Egg Corporation case the statement of the Commission was that "dressed poultry" was not "livestock" within the provision of Section 203(6). The defendant and the Secretary of Agriculture point out that the question of whether "dressed poultry" is livestock is not involved in the present case. They also point out that in the third opinion the Commission reversed its holdings in the second opinion and that such reversal left any statements made by the Commission in the second opinion in a very dubious state. All of the parties are in agreement that in the Determination case, supra, the Commission did construe and interpret Section 203(b) (6) to exclude dressed poultry on the ground that it was a manufactured product. Prior to such determination a trial examiner of that agency had held an extensive hearing. The examiner concluded that dressed poultry was an unmanufactured product. The Commission reversed the examiner and concluded that dressed poultry was a manufactured product within the provisions of Section 203 (b) (6). The defendant and the Secretary of Agriculture claim that the weight to be given to that finding is weakened by the fact that the trial examiner after an extended hearing had found otherwise and by the fact that only four of the Commissioners concurred in the Determination report as a whole.

The weight given by the courts to administrative interpretation is based in part at least upon the theory that a particular agency has "expertness" in a particular field in which it has been entrusted with responsibility by Congress. The Secretary of Agriculture claims that he has been charged with responsibility in the particular field here involved. His claim in that regard is set forth in the brief filed in his behalf as follows:

"By section 203(j) of the Agricultural Marketing Act of 1946 (7 U.S.C. section 1622(j) [7 U.S.C.A. § 1622 (j)]), Congress has authorized and directed the Secretary of Agriculture to assist 'in improving transportation services and facilities *and in obtaining equitable and reasonable transportation rates and services and adequate transportation facilities for agricultural products* and farm supplies by making complaint or petition to the Interstate Commerce Commission * * * with respect to rates, charges, tariffs, practices, and services, or by working directly with individual carriers or groups of carriers' (emphasis supplied). This duty of the Secretary of Agriculture with respect to agricultural products is to be performed in the attainment of the marketing and transportation policy set forth in section 202 of the Agricultural Marketing Act of 1946 (7 U.S.C. section 1621). That policy of Congress provides *inter alia* for 'an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through * * * regulatory activities, to the end that marketing methods and facilities may be improved, that distribution costs may be reduced and the price spread between the producer and consumer may be narrowed, that dietary and nutritional standards may be improved,' and new and wider markets developed. The Secretary of Agriculture is also authorized to participate in proceedings before the Commission relative to rates, charges, tariffs, and 'practices' relating to the transportation of farm products (7 U.S.C. section 1291(a) and (b)), and in such cases the Secretary may take part in the subsequent judicial proceedings (7 U.S.C. section 1291(b)).

"Poultry production has an important place in the agricultural economy of the nation. In 1945 poultry was produced on 80 percent of the nation's farms. In 1949 more than $3,500,000,000, 11 percent of the total gross farm income in the United States, was derived from the sale of poultry and poultry products. The efficient marketing of a large part of the nation's production of poultry and poultry products is dependent upon the availability of motor trucks. In

1950, 76 percent of all shipments of dressed poultry received at the principal markets moved by motor truck. Any action which impedes the availability of motor trucks carrying dressed poultry will result in injury to the agricultural economy."

It is the claim of the Secretary of Agriculture that his responsibility in the matter of the transportation of agricultural commodities is such that the administrative interpretation of the Department of Agriculture as to whether or not "dressed poultry" is a "manufactured product" is entitled to equal weight with that of the Interstate Commerce Commission. In oral argument counsel for the Secretary of Agriculture stated that so far as "expertness" in the matter of farm commodities was concerned the "expertness" of the Department of Agriculture in the matter of the classification of them was not only equal to but, if anything, greater than that of the Interstate Commerce Commission. He further stated that the Department of Agriculture has had more to do with poultry, including the classification thereof, for a much longer period of time than has the Interstate Commerce Commission. The defendant, as heretofore noted, presented evidence at the time of the trial to the effect that the Department of Agriculture classifies "dressed poultry" as an unmanufactured product.

The Interstate Commerce Commission states that it is the particular agency which is charged with the responsibility of enforcement of the provisions of Section 203 (b) (6) and that such being the case its administrative interpretations are entitled to great weight and not the interpretations of the Department of Agriculture.

The defendant and the Secretary of Agriculture point out that, with but one exception, in all of the cases in which the constructions or interpretations that the Interstate Commerce Commission has placed on Section 203(b) (6) have been tested in the courts, its constructions or interpretations have been held to be erroneous. The exception being the case of Interstate Commerce Commission v. Weldon, supra, which defendant and the Secretary

of Agriculture state is of dubious authority in view of later holdings.

In the present case, the only relevancy of administrative construction or interpretation is to the matter of Congressional intent. The question is whether or not the agency making the particular contention or interpretation has correctly ascertained the intent of Congress. Administrative construction or interpretation is but one of several extrinsic aids in the interpretation of statutes. Another extrinsic aid is legislative history. Where the provisions of a statute are ambiguous, the legislative history may often be revealing on the matter of legislative intent and may be more satisfactory evidence of legislative intent than administrative construction or interpretation. In the present case the parties are in controversy as to whether the administrative constructions or interpretations advanced are in accord with the intent of Congress as revealed by the legislative history of the Act. All of the parties contend that the legislative history of the Act supports their respective claims as to the intent of Congress. It would then seem desirable to next give consideration to the legislative history of the Act before proceeding any further with the matter of administrative construction or interpretation.

In the present case, the matters of importance are what was the purpose of Congress in enacting Section 203(b) (6), and what commodities did it intend to include within its provisions? The parties are agreed that the purpose of Section 203 (b) (6) was to benefit the farmers. The amendment was not necessary to relieve the farmers of the expense and trouble of complying with the regulations of the National Motor Carrier Act where they operated their own trucks to transport their produce or farm supplies. They were relieved of that trouble by Section 203(b) (4a) and Section 203(b) (9) of the Act. Section 203(b) (6) provided for exemption for commercial truckers transporting the commodities therein referred to. It is therefore clear that Congress concluded that the farmers would be benefited by hav-

ing the commercial truckers engaged in hauling farm commodities exempted from the certificate provisions of the Act. In Congressional Committee hearings on proposed amendments to Section 203(b) (6), there are frequent references to the matter of the difference in the cost of transportation as between the certificated and uncertificated carriers. In Senate Hearing on S. 2357, an economist appearing in behalf of the National Grange stated, on p. 452 thereof, that the abolition of the exemption would mean an increase of transportation costs for farm products by 15 to 25 per cent. On pages 502 and 503 of Senate Hearing S. 2357 a witness stated that when following the decision in the case of Interstate Commerce Commission v. Love, supra, trucks hauling fish were relieved of regulation the transportation rate on fish between Boston and Chicago dropped from $1.25 a hundred to $1.00 a hundred. On page 376 of Senate Hearing No. 2357 a witness stated that the certificated carriers were rapidly losing out to the uncertificated carriers in the transportation of farm commodities. On page 503 of Senate Hearing No. 50, a witness listed 17 items that made for higher costs on the part of the certificated carriers in comparison to the uncertificated carriers. They were as follows:

"Principal among the expenses borne by the regulated carrier (even when transporting an exempt load) and not incurred by the average itinerant owner-operator are the following: (1) cost of preventive maintenance; (2) cost of supervising transportation and maintaining safety program, including examining and training drivers and safety patrol work; (3) pay for union helper loading and unloading; (4) full union pay scale for driver; (5) extra pay for waiting time; (6) employee benefits of group insurance, etc.; (7) cost of branch terminals for checking equipment, serving shippers on tracers, claims, etc.; (8) cost of tariff publication, and distribution; (9) cost of maintaining claim agent, processing claims and payment of uninsured claims; (10) cargo insurance; (11) public liability and property damage insurance in adequate limits; (12) workmen's compensation insurance; (13) general and administrative expense, including accounting department, communication expense and law expense; (14) State fuel taxes based on reporting mileages; (15) Federal and State unemployment charges; (16) social-security payments by employers or employees; (17) office rents. In addition, such owner-operators customarily do not collect, report and pay the 3-percent Federal transportation tax, which, when not collected from the shipper, becomes the carrier's obligation.

"These services and facilities, which the regulated carrier provides, all cost money and they all are provided in conformity with the requirements of law, the best interest of labor, the needs of the shippers, and protection for the public."

However, in Senate Hearing S. 2352, on page 441 thereof, a representative of the Department of Agriculture stated as follows:

"We believe that the principal reason why sections 203(b) (4a) and (6) were incorporated in the original Motor Carrier Act, 1935, was that the Congress then recognized that the flexible transportation service needed to move farm and fishery commodities could not be performed by general merchandise haulers."

In the present case it was claimed in oral argument by counsel for the defendant and the Secretary of Agriculture that the biggest benefit to the farmers of exempting commercial truckers engaged in hauling farm commodities from the certificate provisions of the Act was the flexibility of operations permitted such carriers. It was stated by them that poultry is a commodity as to which the market is variable and shifting and that it is frequently necessary to be able to make shifts and changes in marketing arrangements on short notice and, in some cases, even when the commodities are en route. It was also stated that the certificated carriers who operated over

fixed routes between specified points were ill adapted for the marketing of poultry. Counsel for the defendant stated in argument that the charges of the defendant for the transportation of dressed poultry were not lower than those of the certificated carriers and that its services were made use of by shippers of poultry because of the flexibility of movement which its trucks enjoyed. In oral argument it was stated by counsel for the Interstate Commerce Commission that, in situations where necessity was shown, the Commission was issuing certificates which permitted flexibility of movement on the part of the trucks operated thereunder. On the matter of Congressional intent, as indicated by the legislative history, all of the parties discussed in their briefs and oral arguments that part of the legislative history relating to the original enactment of the Act wherein the House amended the House Committee Amendment so as to strike out the words "unprocessed agricultural products" and inserted in lieu thereof "agricultural commodities not including manufactured products thereof," 79 C.R. 12,220. In connection with such change, the Interstate Commerce Commission points out that in the discussion relating to the change reference was made to the possibility that there might be some doubt as to whether "pasteurized milk" and "ginned cotton" might not be included within the term "unprocessed agricultural products." The Interstate Commerce Commission contends that the purpose and effect of the change in terms was to include ginned cotton and pasteurized milk within the scope of the exemption. The defendant and the Secretary of Agriculture claim that it was not the intent of Congress by the change in terms to limit the effect of the change to ginned cotton and pasteurized milk. It is the claim of the defendant and the Secretary of Agriculture that by the change in terms Congress manifested the intent that the mere fact that an agricultural commodity had been processed would not cause it to be outside of the scope of the exemption. It is their claim that Congress by the change manifested the intent that farm commodities could be processed without losing their status as an exempt commodity and that it

was only when such commodities had achieved the status of manufactured articles that they lost their exempt status. Those contentions brought the discussion of the parties back to a discussion of the meaning of "manufactured" products which, as heretofore noted, ended in an exchange of definitions.

Very few subparagraphs of a section of a Congressional Act have been the subject of as much Committee consideration as has been subparagraph (b) (6) of Section 203. The Committee Reports show that the words used in that subparagraph have been discussed at length by numerous witnesses and by committee members. At the different Committee hearings there were presented and discussed the problems and difficulties occasioned the Interstate Commerce Commission by the exemptions granted by that subparagraph; the effect of those exemptions upon competition between certified and uncertified carriers; abuses connected with or growing out of those exemptions; the benefits to farmers because of those exemptions; the meanings of the words used in that subparagraph; the different court decisions construing the provisions of that subparagraph; the constructions or interpretations of the Interstate Commerce Commission construing the provisions of that subparagraph, including those which had been overturned by the courts; and the desirability of broadening or restricting the exemptions therein. It is clear that Congress through its Committees has been kept unusually well and fully informed as to matters connected with that subparagraph. The last Committee hearing at which its provisions were considered was on July 28, 1950.

An unusually large number of amendments have been proposed to Section 203(b) (6) and there is an unusually large amount of legislative history material available in connection therewith. The action and attitude of Congress as to proposed amendments could be indicative of Congressional intent as to the scope and coverage of that subparagraph.

Starting as early as 1938 bills were introduced or proposed to amend the provisions of that subparagraph. In 1938 a bill was

introduced which was adopted by Congress, which struck out the word "exclusively" in that part of the subparagraph relating to the use of motor vehicles for other transportation by hire. Act, June 29, 1938, c. 811, § 3, 52 Stat. 1237. The effect of that amendment was to greatly widen the scope of the exemptions afforded in that subparagraph in that it made the commodity being haulted at the time, and not the use of the truck, the test of exemption. Also in 1938 three other bills were introduced which have been heretofore referred to: S. 3768, S. 3941, and H. R. 10508. H. R. 10508 and S. 3941 are identical. S. 3768, among other things, would have limited the scope of Section 203(b) (6) to "unmanufactured products obtained as a result of raising or keeping of livestock, bees, or poultry." Its effect would have been to limit the scope of the exemption. H. R. 10508 and S. 3941 would have had the effect of denying the exemption in cases where the vehicle was used at any time for the hauling of non-exempt commodities. Congress did not enact any of those bills. Starting in 1938 and continuing over the years, bills have been introduced or proposed to amend the provisions of that subparagraph. Those bills and paragraphs have heretofore been detailed. The action or non-action of Congress on them and the attitude of Congress in connection with them could be indictative of Congressional intent as to the coverage of that subparagraph. A resumé or summary of those bills or proposals, and the action of Congress thereon, will therefore be made.

By the Act of June 29, 1938, c. 811, § 3, 52 Stat. 1237, Congress amended the subparagraph by strikng out the word "exclusively" which appeared in the subparagraph as originally enacted relating to the use of motor vehicles which hauled exempt commodities. The effect of striking out the word "exclusively" was to greatly broaden the scope of the exemptions afforded by that subparagraph in that it made the load being hauled at the time the test of exemption.

Also in 1938 three bills were introduced: S. 3768, S. 3941, and H. R. 10508, 75th Congress, 3d Session. S. 3768 would have had the effect of limiting the exemptions of the subparagraph among other ways to "unmanufactured products obtained as a result of raising and keeping livestock, bees, or poultry." H. R. 10508 was identical with S. 3941. The effect of them would have been to eliminate the exemption for any vehicle which hauled non-exempt commodities at any time. Congress did not enact any of the bills. On May 27, 1939, the Legislative Committee of the Interstate Commerce Commission addressed a letter to Senator Wheeler, Chairman of the Senate Committee on Interstate and Foreign Commerce, proposing an amendment to Section 203(b) (6). The proposed amendment would have limited its scope so that only the transportation of farm commodities and other commodities named in Section 203(b) (6) "from the point of production, point of primary market, processing, manufacture or transshipment" would come within its provisions. Senate Committee Report under S. 50, page 820. Congress took no action upon that request. On June 29, 1940, the Legislative Committee of the Interstate Commerce Commission addressed a letter to the Chairmen of Committees on Interstate and Foreign Commerce of the House and Senate proposing an amendment to Section 203(b) (6) which would have restricted the agricultural commodity exemption to the point of entering the channel of interstate commerce. Congress rejected the proposal.

By Act of September 18, 1940, Congress inserted the word "ordinary" preceding the word "livestock" in the subparagraph. The effect of this change was to lead the Commission to change its interpretation of the status of poultry which it had first classed as livestock and therefore exempt only when alive. On May 28, 1943, Senator Lodge introduced a bill, S. 1148, 78th Congress, 1st Session, providing for the amendment of the subparagraph. The effect of the amendment would have been to limit the exemption to transportation by actual producers. Congress did not adopt it. On March 30, 1950, H. R. 7547, 81st Congress, 2d Session, was introduced by Mr. Kilday. If specifically provided that the exemption afforded by the subparagraph should in

the case of poultry be limited to "live poultry" and in general provided for excluding from the exemption those commodities that were "slaughtered, frozen or processed." The Senate Committee on Interstate and Foreign Commerce, acting under S. 50, held the extensive Committee hearings heretofore referred to in connection with transportation problems. In connection therewith hearings were held on H. R. 7547, Senate Committee Report S. 50, pages 811 et seq. The purpose and intended effect of H. R. 7547 is set forth at pages 825 and 826 of that Report. The bill was not enacted. From March 3, 1952, to April 9, 1952, the Senate Committee on Interstate and Foreign Commerce held extensive hearings on S. 2357, 82d Congress, 2d Session. That bill was introduced by Senator Johnson of Colorado. That bill provided that the exemptions provided for in the subparagraph should not be applicable to the transportation of agricultural commodities which had been "processed to a greater extent than is customarily done by farmers prior to their marketing * * *." Senator Johnson filed an amendment to S. 2357 to limit the exempt transportation to the point of "first off-the-farm processing." The bill and the amendment are entitled as bills to "restrict the application of the agricultural and fish exemption for motor carriers" under the Interstate Commerce Act. Commissioner M. W. Splawn, Chairman of the Legislative Committee of the Interstate Commerce Commission, and Commissioner John L. Rogers, Chairman of the Interstate Commerce Commission, appeared before the Senate Committee. Senate Hearing S. 2357, pages 420 et seq. They presented a letter from the Legislative Committee of the Commission. The Legislative Committee, in the letter, stated that there was "no reason why the transportation of agricultural commodities in general should be exempt from regulation after they have been moved to a place of processing or preservation * * *." In the letter that Committee suggested that S. 2357 be amended so as to limit the exemption under 203(b) (6) to "The transportation by motor vehicle for compensation, from farm to market, or to the point of first off-the-farm processing or to storage, of ordinary livestock or agricultural commodities (not including the manufactured products thereof)." Senate Hearing S. 2357, page 425. The amendment offered to S. 2357 by Senator Johnson contained the exact language of the amendment suggested by the Legislative Committee of the Interstate Commerce Commission. In connection with the Senate Hearing on S. 2357, it appeared that doubt had arisen as to whether horticultural products were included within the exemptions provided for by Section 203(b) (6). The Senate Committee held extensive hearings on the matter of restricting the exemption for agricultural and other commodities as proposed by the bill as originally introduced by Senator Johnson and by the amendment to the bill proposed by the Legislative Committee of the Interstate Commerce Commission. There was a rather surprising outcome. The Senate Committee struck out all language in the bill and the amendment to it which would have had the effect of restricting the exemption of farm commodities under Section 203(b) (6) and instead recommended to the Senate that Section 203(b) (6) be liberalized in the matter of exemptions by inserting the words "including horticultural" after the word "agricultural" in that subparagraph. Congress followed that recommendation by the enactment of Public Law 472, 82d Congress, 2d Session, 66 Stat. 479, approved July 9, 1952.

The construction or interpretation of Section 203(b) (6) contended for by the Interstate Commerce Commission would be highly restrictive of the scope of Section 203(b) (6) so far as poultry is concerned.

There are two features that stand out most predominantly in the voluminous legislative history relating to amendments made or proposed to Section 203(b) (6). One feature is that every amendment that Congress has made to it has broadened and liberalized its provisions in favor of exemption and the other feature is that although often importuned to do so, Congress has uniformly and steadfastly refused or rejected amendments which would either directly or indirectly have denied the bene-

fits of the exemptions contained therein to truckers who are engaged in operations similar to that of the defendant herein. It is believed that the actions and attitude of Congress as manifested in connection with amendments to Section 203(b) (6) are preponderantly indicative of an intent on the the part of Congress that the words "manufactured products" used in that subparagraph are not to be given the restricted meaning contended for by the Interstate Commerce Commission herein.

It is the holding of the Court that New York dressed poultry or eviscerated poultry do not constitute "manufactured" products within the intent and meaning of Section 203(b) (6). It is the feeling of the Court that an opposite holding would in reality constitute an attempt to accomplish by means of judical construction that which Congress has steadfastly refused to allow to be accomplished by legislation.

Judgment will be entered in accord with this opinion.